Adriane J. Hofmeyr (AZ Bar No. 025100)
HOFMEYR LAW PLLC
3849 E. Broadway Blvd., #323
Tucson, AZ 85716
Phone: (520) 477-9035
adriane@hofmeyrlaw.com

*Attorney for Plaintiffs*

*Additional Counsel Listed at End*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

## TUCSON DIVISION

| | |
|---|---|
| Center for Biological Diversity; Chiricahua Regional Council; Natural Allies; Wild Arizona; and Conservation CATalyst, | Case No. _____ |
| Plaintiffs, | **COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF** |
| vs. | |
| U.S. Forest Service; Michiko Martin, Regional Forester of the U.S. Forest Service Southwestern Region; U.S. Fish and Wildlife Service; and Amy Lueders, Regional Director of the U.S. Fish and Wildlife Service Southwest Region, | |
| Defendants. | |

## I.  INTRODUCTION

1.     In September 2023, the U.S. Forest Service ("Forest Service") approved and authorized the construction and opening of three roads into three remote canyons in the Chiricahua Ecosystem Management Area ("Chiricahua EMA") in the Coronado National

COMPLAINT– 1

Forest in southeastern Arizona (referred to as the Chiricahua Public Access Project or "the Project").

2.    The Project would impact over 10,000 acres and is intended to open 2,000 acres of pristine national forest to increased disruptive activity, including off-road vehicle use and hound hunting. One of the canyons has been largely closed to motorized traffic for thirty-seven years, allowing endangered and threatened species to thrive, and jaguar have returned to the area.

3.    The Chiricahua EMA has received wide recognition due to its unique species and immense biodiversity. It is also home to, and central to the survival of, one of the last known wild jaguars in the United States, who was given the name Sombra – which translates to "shadow" in Spanish – by students at Paulo Freire Freedom School in Tucson, AZ. It is also home to the threatened Mexican spotted owls ("owl" or "spotted owl") and their critical habitat, as well as almost forty sensitive species.

4.    The Forest Service's environmental review attempts to downplay several harmful impacts the Project will have on species and their habitat. Its attempt to gloss over one issue is particularly glaring: that the expert wildlife agency, the U.S. Fish and Wildlife Service ("FWS"), found the Project will likely displace – or might result in the death of – one of only two known wild jaguars in the United States. Nevertheless, the Forest Service found that the Project will have no significant impacts on wildlife and other resources.

5.    Despite the outsized effect the Project will have on listed and sensitive species and their habitat, the Forest Service's environmental review under the National Environmental Policy Act ("NEPA") failed to address many substantial impacts of the Project. The agency erroneously concluded the Project would result in no significant impacts after preparing a flawed Environmental Assessment ("EA"), resulting in its Decision Notice and Finding of No Significant Impacts ("FONSI") on September 19, 2023.

6. Accordingly, the Forest Service failed to take the requisite "hard look" at the direct, indirect and cumulative impacts of the Project required by NEPA before it was approved, and short-circuited public involvement and the consideration of mitigations for endangered, threatened and sensitive species.

7. To assess impacts to species protected under the Endangered Species Act ("ESA"), the Forest Service relied on a biological opinion ("BiOp") for the jaguar and Concurrence for spotted owls issued by FWS. These documents do not sufficiently analyze adverse impact to the jaguar and spotted owl and critically fail to implement relevant recovery plans for these species. The conservation actions and objectives set forth in these recovery plans are at odds with the Project's purpose of allowing permanent, motorized access to previously restricted areas of the Chiricahua EMA.

8. Because the recovery plan for the jaguar represents the only existing program for the conservation and recovery of jaguars, the Forest Service violated its affirmative duties under Section 7(a)(1) of the ESA by failing to carry out programs for the conservation of the jaguar.

9. The Forest Service further violated its procedural and substantive obligations under Section 7(a)(2) of the ESA by relying on FWS' unlawful and arbitrary BiOp for the jaguar and FWS' Concurrence for the Mexican spotted owl.

10. In addition, the Forest Service failed to ensure the Project complied with its own forest management plan under the National Forest Management Act ("NFMA").

11. As a result of Defendants' actions, endangered, threatened and sensitive species will be imminently subjected to harm and, in the case of the jaguar, may be permanently driven out of his home in John Long Canyon. Accordingly, Plaintiffs bring this civil action for declaratory and injunctive relief to protect the jaguar and other vulnerable species currently residing in the Chiricahua EMA.

## II.    <u>JURISDICTION AND VENUE</u>

12.    Jurisdiction is proper in this Court under the Administrative Procedure Act ("APA"), 5 U.S.C. § 701–706; 28 U.S.C. § 1331 (federal question jurisdiction); 28 U.S.C. § 1346 (United States as defendant); and 16 U.S.C. § 1540(g)(1)(A) (Endangered Species Act ("ESA") citizen suit provision), with claims arising under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*; the National Forest Management Act ("NFMA"), 16 U.S.C. § 1600 *et seq.*; and the ESA, 16 U.S.C. § 1531 *et seq.* The Court has authority to issue declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201–2202 and 5 U.S.C. § 706(2).

13.    The challenged agency actions – the BiOp, Concurrence, Environmental Assessment ("EA"), finding of no significant impact ("FONSI") and Decision Notice – are final and subject to judicial review pursuant to 5 U.S.C. §§ 702, 704, and 706. An actual, justiciable controversy exists between the parties, so the requested relief is proper. 28 U.S.C. §§ 2201–02; 5 U.S.C. §§ 701–706.

14.    Plaintiffs submitted public comments on the EA and objected to the Decision Notice on the Project. Accordingly, Plaintiffs have exhausted all required administrative remedies. Plaintiffs provided Defendants with at least 60 days' notice of the ESA violations alleged herein as required by 16 U.S.C. § 1540(g)(2)(A). Defendants have not remedied the violations set out in that 60-day written notice.

15.    Venue in the District of Arizona is appropriate under 28 U.S.C. § 1391(e) because the Project takes place in the district. Accordingly, a substantial part of the events or omissions giving rise to the claim occurred here. Additionally, Plaintiffs Center for Biological Diversity, Wild Arizona and Conservation CATalyst reside in Tucson, Arizona.

1

### III.    PARTIES

2        16.    Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("the Center") is a

3   national, nonprofit wildlife conservation and public interest organization with more than

4   89,000 members, including 3,592 members in the state of Arizona, dedicated to the

5   protection of endangered species and wild places. The Center and its members are

6   concerned with the management of federal public lands, including public lands under

7   Forest Service management, especially as that management relates to the recovery and

8   viability of native species and habitats. The Center has been engaged in active campaign

9   and litigation efforts to secure and improve protections for jaguars and spotted owls since

10   the 1990s. The Center petitioned for the spotted owl to be listed under the ESA in 1990,

11   then successfully sued to secure and improve designated critical habitat for the owl in

12   1995 and 2001. After FWS removed jaguars from the ESA in 1980, in 1997, in response

13   to a Center campaign, jaguars were again protected as endangered. Since then, the Center

14   has consistently campaigned and litigated over increased protections for jaguars, litigated

15   to successfully halt a proposed open-pit mine in jaguar critical habitat south of Tucson,

16   and petitioned FWS to reintroduce jaguars in New Mexico.

17        17.    The Center is headquartered in Tucson and has staff and members within

18   Arizona, the greater Southwest, and beyond who value the wild, rugged and healthy native

19   ecosystems of the greater Sky Islands ecoregion. Many of these staff and members

20   regularly engage in activities such as hiking, photographing and wildlife viewing for

21   recreational, aesthetic, scientific, conservation, professional, health and other purposes on

22   the Coronado Forest, including the Chiricahua EMA, and intend to continue doing so.

23   These individuals derive recreational, scientific, educational, aesthetic, moral, spiritual

24   and other benefits from their interactions with habitats and wildlife in the Chiricahua

25   EMA. The Center participated in the NEPA process by submitting public comments on

26   the Project EA on November 23, 2020, and – along with co-plaintiffs – submitted

objections to the Decision Notice on July 17, 2023. The Center brings this action on its own behalf and on behalf of its adversely affected members.

18.    Plaintiff CHIRICAHUA REGIONAL COUNCIL ("CRC") is a regional nonprofit conservation organization, based in Portal, Arizona. The primary goal of the CRC is to protect valuable intact habitats in the Chiricahua EMA, in addition to private lands in the Chiricahua, Peloncillo and Dragoon Mountains, as well as nearby areas of southeastern Arizona, southwestern New Mexico and adjacent northern Mexico. To accomplish this, CRC works with the Forest Service, other governmental agencies, and private entities on issues that impact our unique assemblage of habitats, which together comprise North America's greatest terrestrial biodiversity. CRC is the only citizen-based organization in the Chiricahua Mountains with the primary goal of conservation. It promotes responsible land use and wise, science-informed stewardship of our unique natural heritage. CRC represents diverse interests, including ranchers, artists and scientists, as well as year-round and summer residents, homeowners and ecotourism businesses. CRC has individual members who have recreated and plan to continue recreating in the Chiricahua EMA, largely due to its opportunities for quiet recreation, such as hiking and wildlife viewing. CRC's members will be negatively impacted by the construction and opening of roads that will bring disruptive forms of recreation, such as hound hunting and off-road vehicle use, which will likely harm, harass and drive away valuable wildlife from the area. CRC, along with co-plaintiffs, submitted objections to the Decision Notice and EA on July 17, 2023. CRC brings this action on its own behalf and on behalf of its adversely affected members.

19.    Plaintiff NATURAL ALLIES is a nonprofit environmental advocacy organization that has advanced conservation and restoration in the Sky Islands for more than three decades. It defends threatened landscapes and works to permanently protect these special areas. Members of Natural Allies participated in the Forest Planning process.

Additionally, it occupied one of two Quiet Recreation seats on the Travel Management stakeholder group convened by the Coronado Forest for the purpose of providing guidance to line officers in developing a modern transportation system. Natural Allies has individual members who have recreated and plan to continue recreating in the Chiricahua EMA, largely due to its opportunities for quiet recreation, such as hiking and wildlife viewing. Natural Allies' members will be negatively impacted by the construction and opening of roads that will bring disruptive forms of recreation, such as hound hunting and off-road vehicle use, which will likely harm, harass and drive away valuable wildlife from the area. Natural Allies submitting written comments in response to the Scoping Letter on the Project on September 3, 2020. Additionally, Natural Allies, along with co-plaintiffs, submitted objections to the Decision Notice and EA on July 17, 2023. Natural Allies brings this action on its own behalf and on behalf of its adversely affected members.

20.     Plaintiff WILD ARIZONA originally formed in 1979 as the Arizona Wilderness Coalition, an all-volunteer organization instrumental in the passage of two landmark bills that established the ninety designated Wilderness Areas Arizona boasts today, including the Chiricahua Wilderness Area. Wild Arizona's mission is to protect, unite and restore wild lands and waters across Arizona and beyond for the enrichment and health of all generations, and to ensure that Arizona's native plants and animals have a lasting home in wild nature. It organizes and amplifies multi-community voices of support for legislation and special designations; advocates for conservation science-based environmental policy and planning; and cultivates stewardship, social/environmental awareness and well-being through outdoor volunteerism, science and education. Wild Arizona has initiated and provided funding for service projects in the Chiricahua Mountains, particularly with trail maintenance and reconstruction. Wild Arizona has individual members who have recreated and plan to continue recreating in the Chiricahua EMA, largely due to its opportunities for quiet recreation, such as hiking and wildlife

viewing. Wild Arizona's members will be negatively impacted by the construction and opening of roads that will bring disruptive forms of recreation, such as hound hunting and off-road vehicle use, which will likely harm, harass and drive away valuable wildlife from the area. Wild Arizona, along with co-plaintiffs, submitted objections to the Decision Notice and EA on July 17, 2023. Wild Arizona brings this action on its own behalf and on behalf of its adversely affected members.

21.    Plaintiff CONSERVATION CATALYST is a Tucson-based nonprofit organization founded in 2008 that specializes in education, outreach and conducting scientific research on wild cats in conflict with people. Each year, the Executive Director brings advanced college students from 14 different universities to hike John Long Canyon, which serves as the focal location to teach about the convergence of Rocky Mountain and Madrean species. This quiet and spectacular canyon, where students have seen or found signs of spotted owls, goshawks, black bears and even jaguar, is always the location students remember and are inspired by most. The sense of wildness obtained from hiking this canyon is unique, important and irreplaceable. Conservation CATalyst additionally has individual members who have recreated and plan to continue recreating in the Chiricahua EMA, largely due to its opportunities for quiet recreation, such as hiking and wildlife viewing. Conservation CATalyst's members will be negatively impacted by the construction and opening of roads that will bring disruptive forms of recreation, such as hound hunting and off-road vehicle use, which will likely harm, harass and drive away valuable wildlife from the area. Conservation CATalyst, along with co-plaintiffs, submitted objections to the Decision Notice and EA on July 17, 2023. Conservation CATalyst brings this action on its own behalf and on behalf of its adversely affected members.

22.    Plaintiffs and their members have been and will continue to be harmed by the Forest Service's authorization of the Project without sufficiently analyzing and

1    disclosing the significant environmental impacts of road construction and increased
2    human activities in the Chiricahua EMA. The Project will allow the construction of roads
3    that will cause increased disruptive activity in the Chiricahua EMA, including hunting and
4    hound-hunting, wood collecting, camping and other activities, which will cause noise and
5    disturbance; degrade the surrounding public lands, water, air, wildlife, and wildlife
6    habitat; and harm and harass protected species. Such impacts will harm Plaintiffs and their
7    members' use and enjoyment of the public lands, wildlife, wildlife habitat, natural areas,
8    waterways and air quality in areas that are impacted by the Project.

9        23.    Arizona resident Christopher Bugbee currently serves as a Southwest
10   Conservation Advocate for Plaintiff Center, and as general manager and senior researcher
11   for Plaintiff Conservation CATalyst. Through his conservation work, Mr. Bugbee has
12   studied and engaged in conservation work related to jaguars in southeastern Arizona since
13   2012. Since Sombra was sighted in 2016, Mr. Bugbee has worked on documenting him in
14   the Chiricahua EMA. Mr. Bugbee is deeply committed to his conservation work on jaguars
15   in the southwestern United States and is invested in their wellbeing and continued
16   existence in the Chiricahua EMA. Mr. Bugbee generally travels to the Chiricahua EMA
17   one to two times per month to hike, camp and enjoy the quiet, wild nature of the canyons.
18   He specifically seeks out recreation in the Chiricahua EMA due to its remoteness and
19   opportunities to view wildlife and their signs. Mr. Bugbee has concrete plans to visit the
20   Chiricahua EMA several times before the end of the year, including with his family. He
21   believes John Long Canyon is one of the best places to see Mexican spotted owls. He has
22   observed spotted owls in their habitat in John Long Canyon, and is fond of their gentle,
23   curious nature. Mr. Bugbee derives significant recreational, spiritual and aesthetic
24   enjoyment from observing wildlife and wants to see the Chiricahua EMA managed in a
25   manner that protects federally listed and sensitive species. However, if the road
26   construction authorized under the Project proceeds, Mr. Bugbee's interests will be harmed

by noise and disruption due to the construction of the road, which will directly harm and harass wildlife, including spotted owls and the jaguar, and cause Mr. Bugbee to avoid the area or spend his time there documenting the harm to the environment rather than in peaceful enjoyment. Additionally, his interests will be harmed by increased motorized access, additional human presence and activities that the road will allow, such as hunting and wood cutting, which with will forever alter this special area and make wildlife sightings far less likely. Opening the area to increased human activity and hound hunting will also likely cause the jaguar to abandon this now-occupied habitat or, at worst, kill him. As a result, Mr. Bugbee's reasons for visiting this special area would be forever altered.

24.    David Hodges, Arizona resident and Director of Conservation for plaintiff Natural Allies, has been working in conservation for nearly thirty-seven years. Mr. Hodges has regularly traveled to the Chiricahua EMA for at least forty years to survey the area for work and recreate in the wild, remote canyons. He has worked on protecting species such as northern goshawks in the Coronado Forest, and previously worked surveying known and suspected Mexican spotted owl territories and nests. In addition to viewing these species in the Chiricahua EMA, he has observed peregrine falcons in the cliffs near the proposed road in John Long Canyon. He enjoys knowing that the jaguar lives in the Chiricahua EMA and believes the jaguar's presence is an indicator of the wildness of the area. Mr. Hodges derives significant recreational, spiritual and aesthetic enjoyment from observing the natural landscape and wildlife and wants to see the Chiricahua EMA managed in a manner that protects the wild nature of the area, as well as the species who inhabit it. When recreating in the Chiricahua EMA, Mr. Hodges enjoys hiking, birdwatching and wildlife watching, especially in John Long and Horseshoe Canyon, due to the fascinating natural history, species diversity, and opportunities for quiet recreation. According to Mr. Hodges, no other natural area in the country has the

combination of the richness of species diversity and the richness of the history and the culture of the landscape. He has concrete plans to return to the Chiricahua EMA in the fall. Mr. Hodges is extremely concerned that providing increased access to remote areas of the canyons to disruptive forms of recreation – such as off-road vehicles and hunting – will have harmful effects on the wild, pristine nature of the area and the wildlife who live there. He believes that the Project will lead to the loss of quiet recreation that draws him to the area, and that the loss of species in the area, especially in John Long Canyon, would drastically alter his experience. For example, the loss of the jaguar from the area would sadden him and make his visits to the Chiricahua EMA feel less special.

25.    As such, Defendants' actions and the legal violations alleged in this Complaint cause direct injury to the aesthetic, conservation, recreational, scientific, educational, wildlife preservation and other interests of Plaintiffs and their members.

26.    Plaintiffs and their members also have a procedural interest in ensuring Defendants comply with all applicable laws, regulations and procedures pertaining to the management of national forest lands including under NEPA, NFMA and the ESA. Plaintiffs have worked to protect the wild areas in the Coronado Forest, including Chiricahua EMA, as well as the species who live there. Plaintiffs and their members have an interest in preventing the Forest Service from authorizing activities that would harm listed species and their habitats and threaten their continued existence in the Coronado Forest. The relief requested in this litigation would further that goal by requiring additional analysis under NEPA and reconsideration of compliance with the Forest Plan, NHPA and the ESA, and specifically, consider the harm caused by the Project on listed spotted owls, jaguars and other sensitive species and their habitats in the Chiricahua EMA, increasing Plaintiffs' understanding of such impacts and aiding their continued efforts to protect and advocate for these species and their habitats.

27.    Plaintiffs and their members' interests have been, are being, and – unless their requested relief is granted – will continue to be adversely and irreparably injured by Defendants' failure to comply with federal laws. These are actual, concrete injuries, traceable to the Defendants' conduct, that would be redressed by the requested relief. Specifically, if the Court were to set aside the unlawful BiOp, Concurrence, EA, Decision Notice and FONSI, and/or order the Forest Service to halt the Project until it complies with the ESA, NEPA and NFMA, Plaintiffs' and their members' injuries would be redressed because the plans to construct and open the roads would be stopped and better analysis of the Project's harmful impacts could result in a different decision that would have lesser impacts on species and the environment. Plaintiffs have no other adequate remedy at law.

28.    Defendant U.S. FOREST SERVICE is an agency within the U.S. Department of Agriculture that is responsible for applying and implementing the federal laws and regulations challenged in this complaint.

29.    Defendant MICHIKO MARTIN is sued in her official capacity as the Regional Forester for the U.S. Forest Service Southwestern Region, which includes the Coronado National Forest and the Chiricahua EMA. Defendants U.S. Forest Service and Michiko Martin are collectively referred to as "Forest Service" Defendants.

30.    Defendant U.S. FISH AND WILDLIFE SERVICE is an agency within the U.S. Department of Interior that is responsible for applying and implementing the ESA and its implementing regulations. In particular, FWS is responsible for producing biological opinions as part of consultation with federal agencies.

31.    Defendant AMY LUEDERS is sued in her official capacity as the Regional Director of the Southwest Region of the FWS. The Southwest Regional Director is responsible for leading ESA consultations with federal agencies including the Forest Service whose actions may affect species in the region and who was responsible for the

biological opinion challenged herein. Defendants U.S. Fish and Wildlife Service and Amy Lueders are collectively referred to as "FWS" Defendants.

## IV.    LEGAL FRAMEWORK

### The National Environmental Policy Act ("NEPA")[1]

32.    NEPA lays out "a national policy [to] encourage productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321. It is "the basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). Its twin aims are: (1) to foster informed decision-making by requiring agencies to consider the environmental impacts of their proposed actions; and (2) to ensure that agencies inform the public that they have considered environmental concerns in their decision-making.

33.    To accomplish these objectives, NEPA requires federal agencies to prepare a detailed "environmental impact statement" ("EIS") for "major Federal actions significantly affecting the quality of the human environment" that are not categorically excluded under the Act. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4.

34.    To determine whether an EIS is required, the responsible agency may prepare an EA, which must provide "sufficient evidence and analysis for determining whether to prepare an [EIS] or a finding of no significant impact." 40 C.F.R. § 1508.9(a)(1). The agency may forego preparation of an EIS if it makes a "finding of no significant impact" and provides a convincing statement of reasons to explain why a project's impacts are insignificant. *Id*. §§ 1501.4(e), 1508.13.

35.    If the EA establishes that the agency's action may have a significant effect on the environment and the action is not categorically excluded under NEPA, an EIS must

---

[1] Plaintiffs cite to and rely on the NEPA regulations that were applicable prior to September 2020, as that is the version of the regulations that was applied by the Forest Service here. U.S. Forest Service, *Decision Notice and Finding of No Significant Impact for the Chiricahua Public Access Project* 5 (Sep. 19, 2023) ("Decision Notice").

be prepared. Per NEPA's implementing regulations, an assessment of whether an impact is "significant" must consider both the "context and intensity" of the impact. 40 C.F.R. § 1508.27.

36.    "Context" refers to the setting of the proposed action and "intensity" refers to the severity of the impact. *Id*. § 1508.27(a)-(b).

37.    "Intensity" must be evaluated with a host of factors in mind, including but not limited to "[u]nique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas," "[t]he degree to which the action … may cause loss or destruction of significant scientific, cultural, or historical resources," and "[t]he degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act." *Id*. § 1508.27(b).

38.    NEPA requires that the information an agency uses in conducting its environmental review must be "of high quality," and that agencies must "insure the professional integrity, including scientific integrity," of their discussions and analyses, and "shall identify any methodologies used" and "scientific and other sources relied upon" for their conclusions.  *Id*. §§ 1500.1(b), 1502.24. "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." *Id*. § 1500.1(b).

39.    NEPA requires an agency to adequately consider alternatives to its proposed action whether an EA or EIS is prepared.  The agency must "[s]tudy, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  42 U.S.C. § 4332(2)(E).  An agency shall "[r]igorously explore and objectively evaluate all reasonable alternatives," "use the NEPA process to identify and assess the reasonable alternatives to

proposed actions that will avoid or minimize adverse effects of these actions upon the quality of the human environment," and include appropriate mitigation measures to minimize the negative impacts of a project. 40 C.F.R. §§ 1500.2(e); 1502.14(a), (f).

40.    In addition, an agency "shall state how alternatives … will or will not achieve the requirements of section 101 and 102(1) of the Act," which requires agencies to "use all practicable means" to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings" and to "preserve important historic, cultural, and natural aspects of national heritage." 40 C.F.R. § 1502.2(d); 42 U.S.C. § 4331(b). An agency must also determine how alternatives "will or will not achieve the requirements of … other environmental laws and policies." 40 C.F.R. § 1502.2(d). The alternatives analysis is considered "the heart of" an environmental analysis under NEPA. *Id*. § 1502.14.

41.    The CEQ regulations implementing NEPA further require that "public scrutiny [is] essential to implementing NEPA" and, therefore, direct all federal agencies to "insure that environmental information is available to public officials and citizens before decisions are made." 40 C.F.R. § 1500.1(b).

**The Endangered Species Act ("ESA")**

42.    Congress enacted the ESA, in part to provide a "means whereby the ecosystems upon which endangered species and threatened species depend may be conserved…[and] a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1531(b).

43.    The ESA vests primary responsibility for administering and enforcing the statute with the Secretaries of Commerce and Interior. 50 C.F.R. § 402.01(a). The Interior Secretary has delegated this responsibility to FWS for freshwater and terrestrial species. *Id*. § 402.01(b).

COMPLAINT– 15

44.    Section 7 of the ESA requires agencies to "carry[] out programs for the conservation of endangered species and threatened species." 16 U.S.C § 1536(a)(1). The ESA defines "conservation" to mean "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this Act are no longer necessary." *Id*. § 1532(3). Thus, the conservation goal of the ESA includes both survival and recovery of listed species.

45.    The ESA establishes strict standards that require the Forest Service to carefully evaluate and/or mitigate the impacts of its actions. When a species has been listed or critical habitat designated under the ESA, all federal agencies – including the Forest Service – must ensure through consultation with FWS that their programs and activities comply with the ESA. 16 U.S.C. § 1536(a)(2).

46.    Under Section 7(a)(2) of the ESA, all federal agencies must ensure that any action they authorize, fund or carry out is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [their designated critical] habitat." 16 U.S.C. § 1536(a)(2).

47.    Through the consultation process under Section 7(a)(2), federal agencies work with FWS to determine whether their actions will jeopardize listed species' survival or adversely modify designated critical habitat, and if so, to identify ways to modify the action to avoid that result. 50 C.F.R. § 402.14.

48.    For each federal action, the Forest Service must first ask FWS whether any listed or proposed species may be present in the area of the agency action. If listed or proposed species may be present, the Forest Service must prepare a "biological assessment" to determine whether the listed species may be affected by the proposed action. 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12. The biological assessment must include, among other things, "[a]n analysis of the effects of the action on the species and

habitat, including consideration of cumulative effects, and the results of any related studies." 50 C.F.R. § 402.12(f)(4).

49.    If the agency determines that its action is "likely to adversely affect" a listed species or critical habitat, or if FWS does not concur with the agency's "not likely to adversely affect" determination, the agency must engage in "formal consultation." *Id*. § 402.14(a). Effects determinations are based on the direct, indirect and cumulative effects of the action when added to the environmental baseline and other interrelated and interdependent actions. *Id*. § 402.02 (defining "[e]ffects of the action").

50.    The federal agency "shall provide [FWS] with the best scientific and commercial data available or which can be obtained during the consultation for an adequate review of the effects that an action may have upon listed species or critical habitat." *Id*. § 402.14(d). The ESA mandates that the biological opinion analyze the entire agency action to ensure that the action is fully protective of the endangered species and their habitat. 16 U.S.C. § 1536(b)(3)(A).

51.    If FWS concludes that the proposed action will jeopardize the continued existence of a listed species, the biological opinion must outline "reasonable and prudent alternatives." 16 U.S.C. § 1536(a)(4), (b)(3)(A).

52.    If the biological opinion concludes that the action is not likely to jeopardize the continued existence of a listed species, and will not result in the destruction or adverse modification of critical habitat, FWS must provide an "incidental take statement" ("ITS"). The ITS must specify the amount or extent of such incidental taking on the listed species, as well as any "reasonable and prudent measures" that the FWS considers necessary or appropriate to minimize such impact, and set forth the "terms and conditions" that must be complied with by the consulting agency to implement those measures. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i).

COMPLAINT– 17

53.     The regulations require that priority be given to developing reasonable and prudent measures and terms and conditions that avoid or reduce the amount or extent of incidental taking anticipated to occur within the action area. To the extent it is anticipated that the action will cause incidental take that cannot feasibly be avoided or reduced in the action area, the agencies may set forth additional reasonable and prudent measures and terms and conditions that serve to minimize the impact of such taking on the species inside or outside the action area. 50 C.F.R. § 402.14(i)(3).

54.     Taking of listed species without the coverage of an ITS is a violation of Section 9 of the ESA. 16 U.S.C. § 1538.

55.     Under Section 9 of the ESA, it is unlawful for any person to "take" an endangered species. 16 U.S.C. § 1538(a)(1)(B). To "take" means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect a species, or attempt to engage in any such conduct. *Id*. § 1532(19). "Harass" under the Act refers to "an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering," while "harm" refers to "an act which actually kills or injures wildlife [including] significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.

56.     Under Section 4(f) of the ESA, the Service is required to prepare recovery plans for the "conservation and survival" of listed species. 16 U.S.C. § 1533(f)(1). Recovery plans establish recovery goals and objectives, describe site-specific management actions recommended to achieve those goals, and estimate the time and cost required for recovery. 16 U.S.C. §1533(f). Section 4(f) specifically requires that the Secretary of the Interior to both "develop *and implement* plans for the conservation and survival of endangered species and threatened species." 16 U.S.C. § 1533(f) (emphasis

added). Drafting a recovery plan is not sufficient to comply with this statutory mandate. Consistent with the intent that recovery plans actually be implemented, Congress required that recovery plans incorporate "a description of such site-specific management actions as may be necessary to achieve the plan's goal for the conservation and survival of the species." *Id.* § 1533(f)(1)(B)(i).

**The National Forest Management Act ("NFMA")**

57.     NFMA establishes the statutory framework for management of the National Forest System. 16 U.S.C. §§ 1600 *et seq*. It imposes both procedural and substantive requirements on the Forest Service's management of national forests. *Hapner v. Tidwell*, 621 F.3d 1239, 1246 (9th Cir. 2010).

58.     Procedurally, NFMA requires the Forest Service to develop a Land and Resource Management Plan ("Forest Plan" or "land management plan") for each national forest, including the Coronado Forest. A forest plan provides for multiple-use management of the national forest, including outdoor recreation, range, timber, wildlife and fish and wilderness. 16 U.S.C. § 1604(e)(1). Substantively, NFMA requires that the forest plans adopted by the Forest Service provide certain protections, such as protection of forest habitat and diversity of wildlife. *See Id*. § 1604(g)(3)(B).

59.     NFMA also requires that "[r]esource plans and permits, contracts, and other instruments for the use and occupancy of National Forest System lands … be consistent with the land management plans." 16 U.S.C. § 1604(i). To that end, "[e]very project and activity must be consistent with the applicable plan components. A project or activity approval document must describe how the project or activity is consistent with applicable plan components." 36 C.F.R. § 219.15(d).

60.     "A project is consistent if it conforms to the applicable 'components' of the forest plan, including the standards, guidelines, and desired conditions that are set forth in

the forest plan and that collectively establish the details of forest management." *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018).

**The Administrative Procedure Act ("APA")**

61.    Pursuant to the APA, a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof. 5 U.S.C. § 702.

62.    "Agency action made reviewable by statute and final agency actions for which there is no adequate remedy in court are subject to judicial review." *Id*. § 704.

63.    The APA directs a court to "compel agency action unlawfully withheld or unreasonably delayed;" and to hold unlawful and set aside agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or agency action that is undertaken "without observance of procedure required by law." *Id*. §§ 706(1), 706(2)(A), (D).

## V.    PROCEDURAL BACKGROUND

64.    On October 21, 2020, the Forest Service published a draft EA of a proposal "to restore and secure permanent, legal motorized access to existing National Forest System… roads in three localities by constructing 2.6 miles of new road segments" in the Chiricahua EMA. The construction of these "access points" would open or reopen over twenty miles of roads within the Chiricahua EMA by allowing disruptive motorized access to approximately 2.8 miles of roads in John Long Canyon, 4.1 miles of roads in North Fork of Pinery Canyon, and securing motorized public access to 16 miles of roads in Horseshoe Canyon.

65.    On November 23, 2020, Plaintiffs Center for Biological Diversity, CRC, Natural Allies and Wild Arizona submitted comments on the draft EA for the proposed project.

66.     On July 21, 2021, the Forest Service produced a Biological Assessment as part of the formal consultation with FWS under Section 7 of the ESA for the endangered jaguar.

67.     On February 23, 2022, FWS produced a Biological Opinion in relation to the jaguar, which appended a Concurrence with the Forest Service's conclusion that the Project "may affect, not likely to adversely affect" the Mexican spotted owl and their critical habitat.

68.     On May 31, 2023, the Forest Service published a final EA and a draft Decision Notice and FONSI.

69.     On July 17, 2023, Plaintiff Center for Biological Diversity submitted objections on behalf of all Plaintiffs in opposition to the EA and draft Decision Notice and FONSI.

70.     On September 1, 2023, the Forest Service, through the Coronado Forest Supervisor's Office, sent a response to the Center's comments.

71.     On September 19, 2023, the Forest Service's Douglas Ranger District published its final Decision Notice and FONSI.

72.     On May 23, 2024, Plaintiffs sent their sixty-day notice of intent to sue with respect to the ESA violations alleged in this Complaint.

## VI.    FACTUAL BACKGROUND

**The Chiricahua EMA**

73.     The Project area falls wholly within the Chiricahua EMA, which includes 284,621 acres of the Coronado Forest, encompassing nearly all the Chiricahua Mountains.

74.     At the heart of the Chiricahua EMA lies the 87,169-acre Chiricahua Wilderness, which supports diverse plant life and populations of birds.

75.     The Chiricahua EMA supports a unique combination of vegetation, habitats and wildlife, thus harboring globally important biological diversity, with distinct species

that have evolved due to barriers to movement. The Sky Islands region, which includes the Chiricahua EMA, has received national and international recognition for its conservation value.

76.     The Chiricahua EMA provides a wide variety of opportunities for exploration, solitude, natural risk, challenge and primitive and unconfined recreation. Wild landscapes harbor the Coronado Forest's richest concentration of quiet places, with the sights and sounds of humankind substantially unnoticeable. Developments (such as fences, structures and water containment features) are rare; those that exist offer visitors a glimpse of past cultures and traditional land uses.

77.     The Forest Service has acknowledged that "[b]ecause of the lack of motorized public access, …[t]he areas offer beautiful scenery, quiet recreation settings, and access to trails (including trails into the Chiricahua Wilderness)."[2] Nevertheless, the Coronado Forest Plan recognizes that the loss of opportunities for such recreation is an issue.

78.     Eleven federally listed species and one designated critical habitat were identified in a species list provided to the Forest Service by FWS "that may occur and/or may be affected by the proposed project."  These include endangered jaguar (*Panthera onca*) and threatened Mexican spotted owls (*Strix occidentalis lucida*) and the owl's critical habitat.

79.     Management of the Chiricahua EMA, which is situated in the Coronado Forest, is governed by the Coronado National Forest Land and Resource Management

---

[2] U.S. Forest Service, *Chiricahua Public Access Environmental Assessment* 18-19 (May 31, 2023), https://www.fs.usda.gov/project/?project=57856.

Plan ("Coronado Forest Plan" or "Plan"). The Plan was first implemented in 1986 and was substantially revised in 2018.[3]

80.    The Plan includes standards and guidelines governing projects and decisions impacting the Forest. Standards are defined in the Plan as "constraints upon project and activity decisionmaking," which serve as an "absolute requirement to be met in the design of projects and activities," whereas guidelines are "components with which a project or activity must be consistent" through either being designed "exactly in accord with the guideline" or through "effective[ness] in meeting the purpose of the guideline to contribute to the maintenance or attainment of the relevant desired conditions and objectives." Coronado Forest Plan at 12. The Plan establishes standards, guidelines and desired conditions for, *inter alia*, Animals and Rare Plants, Motorized Transportation, Public Access and the Chiricahua EMA. *See id*. at 65–68, 72–74, 74–76, 127–131.

81.    Guidelines set forth in the Plan govern the construction of roads and protection of federally listed species – *inter alia*, via application of relevant recovery plans and protection of habitat – which comport with desired conditions aimed at minimizing "unneeded roads" to reduce disturbance or impediments to wildlife and otherwise protect native species.

**The Project**

82.    In its Decision Notice, the Forest Service authorized the construction of three new roads ("2.7 miles of new road segments") into three remote canyons in the Chiricahua EMA: (1) John Long Canyon (on the western slope), (2) North Fork of Pinery Canyon (to the north) and (3) Horseshoe Canyon (on the southeastern slope).

---

[3] U.S. Forest Service, *Coronado National Forest Land and Resource Management Plan* (Apr. 2018), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd583208.pdf.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16



Figure 1. Chiricahua Public Access project vicinity map and proposed action areas¹

83.     The Forest Service's stated purpose of the Project is providing "permanent, legal, motorized public access" to the three canyons, due to a purported need for and lack of such access. However, these canyons can be accessed via non-motorized means, providing opportunities for recreation while maintaining the pristine, wild nature of the area and protecting biodiversity and natural resources.

84.     The construction of these proposed roads for motorized access and the resulting increase in human use and activity in these remote areas will cause significant harm and disturbance to protect species and their habitat.

85.     According to the Project EA, road construction will involve "blasting or use of track hoe with hammer or trimmer in some locations due to bedrock," and "heavy

equipment such as bulldozers, track hoes, dump trucks, and motor graders would be used." Construction of certain roads will involve a "disturbance footprint" approximately 30 feet wide, require stream crossings, installation of gates, and construction of cattle guards ("by excavating a 14 foot long, 8 foot wide, and 3 feet deep pit") and a new "bat gate" would need to be installed to "block the entrance" to a tunnel. Construction will produce dust and noise that will "detract from the quiet recreation settings" in the canyons. EA, *supra* note 2, at 19.

86.    The "action area" (the area that will experience direct and indirect effects because of the Project) is 10,504 acres of the Chiricahua EMA. Once construction is complete, newly opened motorized access to the three remote canyons would increase public use in these areas, and the 10,504-acre action area.

87.    The Forest Service expects that visitors accessing the area using the new roads will "participate in a wide variety of dispersed recreational uses including off-highway vehicle touring, camping, hunting, and hiking," with an estimated additional 2,000 acres expected to open to "dispersed camping" in the Chiricahua EMA. EA, *supra* note 2, at 19.

**Jaguar (*Panthera onca*)**

88.    Jaguars are large, carnivorous felids who once roamed throughout the American Southwest, until they were hunted to local extinction by the 1960s. With a profusion of rosettes scattered across their robust frames, jaguars weigh in as the largest cat in the Americas and the third largest in the world.

1
2
3
4
5
6
7
8
9
10
11



*Remote camera image of Sombra, a wild jaguar in the Chiricahua Mountains of Arizona*
*Photo: Russ McSpadden*

89.    The jaguar has been listed in the United States as an endangered species under the ESA since 1972.

90.    According to FWS, "[s]ince the early 2000s, the jaguar's habitat has declined by 20%, and threats to the species have intensified." In addition to habitat loss and fragmentation, jaguar populations are threatened by killing for trophies and illegal trade in their parts. They also are threatened by killing in retaliation for livestock depredation, and to reduce perceived competition for wild meat with humans.

91.    One of the three canyons that will be impacted by the Project, John Long Canyon – which has been protected from intrusive motorized activity for approximately thirty-seven years – "currently provides high quality habitat for jaguars because it is remote with rugged terrain, has permanent water and dense canopy cover, and is not

frequently accessed by people."[4] Jaguar prey abundance is high in the area due to the current lack of hunting pressure.

92.    This canyon is home to one of two known jaguars inhabiting the United States. According to the Forest Service, "[o]ne male jaguar has been sighted repeatedly within the Chiricahua and Dos Cabezas Mountains area from November 2016, through at least August 2021." BiOp, *supra* note 4, at 15. Additional sightings in 2023 confirm the jaguar's continued presence. Additionally, the BiOp for the Project concluded that "[b]ecause suitable habitat exists within the action area … and this jaguar has been photographed throughout these two mountain ranges, it is reasonable to assume that it occurs within the action area of this project." *Id.*

93.    In 2018, FWS approved a Jaguar Recovery Plan prepared pursuant to ESA Section 4(f). The Jaguar Recovery Plan was produced by the Jaguar Recovery Team, which is led by FWS and includes the Forest Service.

94.    The Jaguar Recovery Plan includes Recovery Objectives, which describe the specific conditions under which the goals for recovery of the jaguar will be met, and Recovery Actions, which "guide site specific management (recovery) actions to address threats [to jaguars] and achieve [established] recovery criteria."[5]

95.    Relevant Recovery Objectives set out in the Recovery Plan include (1) assessment, protection and restoration of "sufficient quantity, quality, and connectivity of habitat to support viable populations of jaguars;" and (2) assessment, minimization and mitigation of the effects of expanding human development on jaguar survival. Jaguar Recovery Plan, *supra* note 6, at 88.

---

[4] U.S. Fish & Wildlife Service, *Biological Opinion on the Chiricahua Public Access Project* 15 (Feb. 23, 2022).
[5] Jaguar Recovery Team, *Jaguar Recovery Plan (Panthera onca)* 102 (Jul. 27, 2018), https://www.fws.gov/node/68724.

1    96.    Relevant Recovery Actions in the Recovery Plan include (1) restoring

2    jaguar habitat and corridors through site-specific methods and minimizing the impact of

3    roads on jaguars; (2) increasing the number and total area of protected areas for jaguars;

4    (3) maintaining and increasing the number and total area of protected areas containing

5    "high-quality jaguar habitats or that serve as important corridors" for jaguar movement in

6    the Borderlands Security Area; (4) establishing guidelines and protocols for jaguar-

7    compatible infrastructure construction and development – including roads – which "may

8    include determining minimum buffer distances between jaguar habitat and

9    infrastructure/development projects;" (5) identifying and prioritizing lands for habitat

10    restoration and implementing habitat restoration "on a priority basis to benefit jaguars;"

11    (6) minimizing impacts of roads on jaguars; and (7) designing roads to minimize habitat

12    fragmentation and impacts on jaguar movement. *Id*. at 105–25.

13    97.    According to the Jaguar Recovery Plan, range-wide habitat destruction,

14    modification and fragmentation are the most significant threats to the jaguar. Rates of

15    jaguar extirpations continue to increase, mainly due to habitat alteration. The Recovery

16    Plan further explains that fragmentation of forest habitat isolates jaguar populations so

17    that jaguars are more vulnerable to human persecution, and that "creating more protected

18    areas is among the most important conservation actions for jaguars and other large

19    carnivores, indicating that conservation of key habitat areas is critical to the recovery of

20    jaguars." *Id*. at 46.

21    98.    Further, the Jaguar Recovery Plan explains that "viable jaguar populations

22    should be secured throughout their range by removing, reducing, and mitigating primary

23    threats to the jaguar (habitat loss and fragmentation, illegal killing …, and unsustainable

24    depletion of jaguar prey resources)," which will "require protecting jaguar habitat

25    quantity, quality, and connectivity." The Plan emphasizes that "conservation of key jaguar

26    habitat … and populations will be critical to the recovery of jaguars." *Id*. at 81.

1    **Mexican Spotted Owl (*Strix occidentalis lucida*)**

2        99.    One of the largest owls in North America, with a wingspan of forty-five

3    inches, the Mexican spotted owl is a shy bird, chestnut-brown in color, with dark eyes and

4    white and brown spots on their abdomens, backs and heads. Their brown tails are marked

5    with thin white bands.

6        100.   In 1993, the species was listed as threatened under the ESA.



*Mexican Spotted Owl (Strix occidentalis lucida)*
*Photo: Robin Silver*

21       101.   Females lay one to four eggs (usually two) during early spring. Most owlets

22   leave the nest in June, about thirty-five days after hatching. Three weeks later, the young

23   can use their talons to hold and tear prey on their own, but their parents continue to feed

24   them until they become fully independent. Survival rate for the young is low, and lifespan

25   is sixteen to seventeen years in the wild.

26

102.    Among other threats, habitat destruction and disturbance via logging, urban encroachment, mining, large-scale recreational developments and wildfire threaten these owls.

103.    According to FWS, the Mexican spotted owl occurs in forested mountains and canyonlands throughout the southwestern U.S. and Mexico. While the owls occupy a broad geographic area, they do not occur uniformly throughout their range. Instead, the spotted owl occurs in disjunct areas that correspond with isolated mountain ranges and canyon systems.

104.    On August 31, 2004, FWS designated approximately 3.5 million hectares (8.6 million acres) of critical habitat for the Mexican spotted owl on Federal lands in Arizona, Colorado, New Mexico and Utah, including in the Chiricahua EMA. Endangered and Threatened Wildlife and Plants; Final Designation of Critical Habitat for the Mexican Spotted Owl, 69 Fed. Reg. 53181, 53216 (Aug. 31, 2004).

105.    There is owl habitat in John Long Canyon, and the Project will open approximately thirty-eight acres of spotted owl critical habitat for camping and fuelwood collection. Additionally, road construction in the North Fork of Pinery Canyon will allow for access to approximately 331 acres of critical habitat for camping and fuelwood collection within the 300-foot buffer of the road.

106.    A Mexican Spotted Owl Recovery Plan ("Owl Recovery Plan") was initially developed and approved in 1995. The current, operative Plan was approved by FWS in November 2012, and prepared by the Mexican Spotted Owl Recovery Team, also led by FWS with participation by the Forest Service.

107.    The Owl Recovery Plan recognizes that "[h]uman-managed alteration of forests in the southwestern U.S. has resulted in extensive areas of Mexican spotted owl habitat that are now more vulnerable to the effects of stand-replacing wildland fires."[6]

108.    The Owl Recovery Plan calls for the establishment or amendment of land-management-planning documents to adopt the Owl Recovery Plan recommendations as agency policy, and maintenance or enhancement of existing nesting/roosting habitat for spotted owls. It also calls for minimization of recreational disturbance in Protected Activity Centers – which encompass a minimum of 600 acres surrounding known owl nest/roost sites – and calls on the Forest Service to evaluate construction within PACs on a case-by-case basis, assess the impacts of currently allowed recreational activities and institute limitations, consider seasonal closures of specifically designated recreation, and implement actions to minimize noise disturbance within Protected Activity Centers during breeding season.

109.    The BiOp for the Project notes that a pair of spotted owls was observed in the vicinity of one project area in John Long Canyon and that "approximately 4.8 acres of the proposed 600-acre [Protected Activity Center] are within the 300-foot buffer of roads that may experience semi-permanent habitat effects and disturbance due to use by dispersed campers." BiOp, *supra* note 4, at 32–33.

110.    Further, the proposed endpoint of the road will expose approximately 38 acres of spotted owl critical habitat to increased camping and fuelwood collection.

111.    Impacts from firewood cutting were largely dismissed in the BiOp, although the conservation measures included as part of the Project design suggest leaving wood from construction to reduce "the potential for recreationists to cut standing trees for

---

[6] Mexican Spotted Owl Recovery Team, *Mexican Spotted Owl Recovery Plan, First Revision (Strix occidentalis lucida)* 34 (Sep. 5, 2012), https://www.fs.usda.gov/Internet/FSE_DOCUMENTS/fseprd475767.pdf.

firewood within owl habitat," and that construction of the road within John Long Canyon will increase firewood cutting, noise and other activities that will disturb owls.

**Sensitive Species**

112.    The Chiricahua EMA is home to thirty identified sensitive species and an additional seventeen sensitive species that have been listed as having the potential to occur.

113.    Sensitive species include the Chiricahua Fox Squirrel, Elegant Trogon, American Peregrine Falcon, Chiricahua Rock Daisy, Northern Goshawk, Eared Quetzal, Sonoran Desert Tortoise and Western Red Bat.

**2022 Biological Opinion**

114.    In its Biological Assessment, the Forest Service determined that eleven federally listed species and one designated critical habitat may occur and/or may be affected by the Project. The Forest Service further determined that only one of those species – the jaguar – is likely to be adversely affected. Based on its adverse impact determination regarding the jaguar, the Forest Service engaged in formal consultation with FWS. On February 23, 2022, FWS produced its BiOp for the Project.

115.    The BiOp explains that increased human presence resulting from the Project will adversely impact the jaguar, which may lead to abandonment of his home in the Chiricahua EMA. It states that, in addition to acoustic/auditory and visual disturbance from construction activities, which could cause abandonment and avoidance of the Project area, "the greatest impact to jaguars from this project is the long-term increased human presence," and that these activities "may cause jaguars to avoid areas with high human use (in particular, hunting using dogs)." BiOp, *supra* note 4, at 20.

116.    The BiOp only provides some conservation measures; however, it fails to address the most pressing harms to the jaguar from the Project, namely the permanent increase in human disturbance and exposure to hunters, including hound hunters. The

nominal conservation measures include, *inter alia*, (1) that construction involving "heavy equipment use or blasting" only take place between October and February; (2) that construction workers check visible space underneath all vehicles and heavy equipment for federally listed species and all other wildlife; (3) a prohibition on night construction or use of night lighting; (4) seasonal closure of the road into John Long Canyon from March to August; and (5) limiting use of 1.2 miles of one road to administrative access. *Id*. at 7–8.

117.   While conservation measures noted in the BiOp include "[a]ppl[ication] of habitat management objectives and species protection measures from approved recovery plans" to activities occurring within listed species habitat, *id*. at 8, the BiOp fails to implement the Jaguar Recovery Plan. For example, it fails to address the need to design the road in a manner that minimizes habitat fragmentation and impacts on jaguar movement.

118.   The BiOp also incorporates by reference the Forest Service's "conservation measures" for the action "including avoidance and minimization measures, status surveys, biological and compliance monitoring, and reporting measures are incorporated herein by reference as reasonable and prudent measures and terms and conditions to address the incidental take of the jaguar." Beyond that, the BiOp concludes that "[n]o additional reasonable and prudent measures were identified during consultation." *Id*. at 22.

119.   Having acknowledged substantial data showing that the continued existence of the jaguar in the three remote canyons of the Chiricahua EMA is at risk from the Project, FWS nonetheless concluded that the Project is not likely to jeopardize the continued existence of the jaguar.

120.   FWS discounted site-specific impacts to the jaguar in the three canyons on the basis that "Forest Service does not anticipate increased visitation to the Chiricahua Mountains *overall*." *Id*. at 20 (emphasis added).

121.   The BiOp provides an ITS that exempts the take of one jaguar every ten years, essentially acknowledging and allowing the extirpation of the one known jaguar from the Chiricahua EMA – one of only two known jaguars remaining in the U.S.

122.   FWS considers the take exceeded if, over a ten-year period, a jaguar is found injured or killed, or no jaguars are detected in the Chiricahua EMA. In that case, the Forest Service and FWS would "work together to determine if reinitiation of consultation is warranted." *Id.* at 21.

## VII.   CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

### Against Forest Service Defendants

### Violations of NEPA and the APA

123.   Plaintiffs incorporate by reference all preceding paragraphs.

124.   NEPA requires federal agencies undertaking federal actions, like the Project, to take a "hard look" at the direct, indirect and cumulative impacts of such actions. Nevertheless, here the Forest Service failed to take the requisite hard look at various impacts from the Project to the Chiricahua EMA, especially to endangered, threatened and sensitive species who live there. Further, the limited analysis provided in the EA and the Forest Service's own data demonstrates that, contrary to the conclusion set forth in the Decision Notice and FONSI, the Project may have a significant impact on the human environment.

125.   The agency failed to adequately analyze the impacts of fragmentation of the jaguar's habitat, which is recognized in the Jaguar Recovery Plan as one of the most significant threats to the species, especially considering other current threats to the jaguar's possible habitat and movement. For example, the Forest Service failed to consider the effects of other projects that cause cumulative impacts to jaguar habitat including the effects of mining operations in nearby areas such as the Hilltop Mine – a lead, copper and

1    zinc mine located to the northeast of John Long Canyon, as well as the effects of a nearby

2    new border road that the agency is proposing to build.

3      126. The Forest Service also failed to take a hard look at direct, indirect, or

4    cumulative impacts on spotted owls and their critical habitat. One of the most significant

5    threats to spotted owls that the agency failed to adequately analyze is the threat of wildfire

6    on spotted owl habitat. As the Owl Plan points out, human-caused alteration of forests in

7    the American Southwest has rendered extensive areas of spotted owl habitat more

8    vulnerable to wildfires. While the EA briefly addressed potential cumulative effects from

9    vegetation management projects, including prescribed burning, the Forest Service's sparse

10   analysis of potential adverse impact from fire risk failed to address the likely increase of

11   fire collection and campfires and other ignition sources that will result from increased

12   recreation and visitation to John Long Canyon that serves as a basis for the Project.

13   Instead, the agency unreasonably concludes that, because roads provide access for fire

14   suppression and "can serve as fire breaks" in the landscape, the Project is expected to have

15   a "negligible" effect on fire and fuels, requiring no further analysis. EA, *supra* note 2, at

16   18. The agency failed to discuss, analyze, or consider that wildfires are almost twice as

17   likely to occur in a roaded area open to motorized vehicles than a roadless area, and

18   invasive weeds and grasses common along roadsides and spread due to construction and

19   motorized use create highly combustible fine fuels.

20     127. Additionally, the Forest Service failed to consider that the Project will

21   further increase fire risk by increasing human visitation, including camping, in John Long

22   Canyon, which will cause additional campfires and fuelwood collection in and near

23   spotted owl critical habitat. Indeed, human-ignited wildfire is almost five times more

24   likely to occur in a roaded area than in a roadless area. Yet the Forest Service failed to

25   acknowledge that forest roads can increase the occurrence of human-caused fires, whether

26   by accident or arson, and road access has been correlated with the number of fire ignitions.

1    128.    The Forest Service also failed to analyze the fire risk from increased access
2  to the Chiricahua EMA for off-road vehicle use. The EA states that the Project would
3  "provide additional opportunities for visitors to enjoy their public lands and participate in
4  a wide variety of dispersed recreational uses including off-highway vehicle touring." EA,
5  *supra* note 2, at 19.

6    129.    The Forest Service additionally failed to take a hard look at the impacts of
7  the Project on the peregrine falcon, northern goshawk, or any other sensitive species. The
8  EA notes that the Project may impact sensitive species due to modification of habitat and
9  forage areas, direct mortality of individuals, indirect effects to prey species, and short-
10  term effects to nesting and roosting areas. EA, *supra* note 2, at 24. The Biological
11  Evaluation further explains that habitat for sensitive species occurs in the Project action
12  area, and that permanent impacts would affect approximately sixteen acres of breeding
13  and foraging habitat. The EA further notes that analysis of the impacts on these species
14  was included in the biological assessment and biological evaluations, and that "design
15  features, including restriction of motor vehicle access from the final 1.2 miles of road in
16  John Long Canyon and closure of the entire road during the nesting season to protect
17  Mexican spotted owl, goshawk, and peregrine falcon, have been added to the
18  environmental assessment." *Id*. at 4. However, nowhere in the EA or Biological
19  Assessment was there adequate analysis of potential threats or adverse impacts
20  specifically to those species. For example, the EA failed to analyze the Project's impacts
21  on goshawks and their nests from, among other things, anticipated increases in human
22  activity and visitation to John Long Canyon, and failed to address the guidelines set out
23  in the Coronado Forest Plan to protect goshawks, as explained in greater detail below. *See*
24  Coronado Forest Plan, *supra* note 3, at 67.

25    130.    Further, the Forest Service's Decision Notice and FONSI is arbitrary and
26  capricious considering the acknowledged adverse impacts of the Project on the listed

species and the environment. Defendants anticipate that the Project may adversely affect the jaguar leading to local extinction through, at best, avoidance and/or abandonment of his home in John Long Canyon and, at worst, injury or death from human-jaguar conflict. The likely extirpation of one of only two jaguars – a species of tremendous ecological and cultural importance – known to inhabit the U.S. is a serious and outsized environmental impact, needing robust and serious consideration of all potential harms, consequences, and impacts required by NEPA flowing from the Project. Additionally, the Project undermines the conservation objectives and actions set out in the Jaguar Recovery Plan. For example, the Project reduces "protected areas" for jaguar, whereas the Plan calls for the preservation, restoration and creation of protected areas and corridors for jaguars because "conservation of key habitat areas is critical to the recovery of jaguars." The Project also undermines the Plan's goal of minimizing impacts of roads on jaguars through, *inter alia*, "designing roads to minimize jaguar habitat fragmentation and impacts on jaguar movement." Because the Project, by design, undermines key components of the Jaguar Recovery Plan and will almost certainly significantly negatively impact one of the only wild jaguars in the country, the Forest Service's EA is inadequate, the FONSI is unsupported, and its reliance on those documents to comply with NEPA is arbitrary and capricious.

131.    Finally, the Forest Service failed to adequately consider alternatives to its proposed action and include "appropriate mitigation measures" to minimize negative impacts of the Project, especially from the anticipated increase in motorized activity and shift in human use and disturbance in John Long Canyon. 40 C.F.R. §§ 1500.2(e), 1502.14(a), (f). For example, as explained above, the Forest Service's proposed plan to limit motorized activity to administrative use for 1.2 miles of road into John Long Canyon and temporarily close the road between March and mid-August fails to protect federally listed and sensitive species from harmful, disruptive activity in their habitat when they are

particularly vulnerable, such as the mountain lion hunting season – which occurs between August and May – or the period during which goshawk nests must be protected human disturbance set out in the Coranado Forest Plan, which extends until the end of September. In its EA and Decision Notice, the Forest Service considered only two alternatives: doing nothing (i.e., building no new roads), on the one hand, and the Project (i.e., building three new roads into three remote canyons in the Chiricahua EMA), on the other. It failed to consider any reasonable alternatives that would mitigate the most significant impacts to species and the environment such as an alternative that would not construct a road into John Long Canyon, which contains significant habitat for federally listed species, and which is anticipated to experience increased human use and visitation resulting from the Project.

132.    For the reasons stated above, the EA and FONSI are arbitrary, capricious and not in accordance with NEPA and its implementing regulations and must be held unlawful and set aside under 5 U.S.C. § 706.

### SECOND CLAIM FOR RELIEF

### Against FWS Defendants

### Violations of the ESA and the APA

133.    Plaintiffs hereby incorporate by reference the allegations presented in all preceding paragraphs.

134.    FWS's analysis and conclusions regarding impacts to listed species laid out in its BiOp for the jaguar and Concurrence for spotted owls fail to utilize the best available science and contain internal consistencies and inadequate analysis of harm to these species and their habitats. Accordingly, these analysis documents and the conclusions contained therein are arbitrary and capricious and fail to satisfy FWS's obligations under ESA Section 7(a)(2). Further, FWS failed to include monitoring and reporting requirements required by the ESA in the BiOp for the jaguar. In reaching the erroneous conclusion in

1  the Concurrence that the Project "is not likely to adversely affect" spotted owls and their

2  critical habitat, it failed to engage in formal consultation on spotted owls.

3      135.   The ESA requires federal agencies to "insure" that agency actions are not

4  likely to cause jeopardy or result in the destruction or adverse modification of critical

5  habitat. 16 U.S.C. § 1536(a)(2).

6      136.   Through formal consultation, agencies must "use the best available

7  scientific and commercial data available" in formulating biological opinions of the

8  impacts of agency actions, any reasonable and prudent alternatives, and reasonable and

9  prudent measures to minimize the impacts of incidental take (mitigation measures). 50

10  C.F.R. §§ 402.14(g)(8), 402.02.

11      137.   The FWS's analysis in its BiOp is arbitrary and capricious because it fails

12  to rely on the best available science, in particular, relevant recovery plans; contains

13  internal consistencies; and provides inadequate reasonable and prudent measures to

14  minimize impacts to the jaguar in the ITS. In addition, the BiOp fails to set out monitoring

15  and reporting requirements for the jaguar as required by the ESA.

16      138.   Biological opinions are "final agency actions" subject to review under the

17  APA. A final agency action may be set aside if it is arbitrary and capricious and/or if it

18  was made without observance of a procedure required by law.

19      139.   In a biological opinion, FWS must *inter alia* "evaluate the current status and

20  environmental baseline" of listed species, "evaluate the effects of the action and

21  cumulative effects" on the listed species, and "formulate an opinion as to whether the

22  action is likely to jeopardize the continued existence of listed species or result in the

23  destruction or adverse modification of critical habitat." 50 C.F.R. § 402.14(g).

24      140.   FWS is obliged to use "the best scientific and commercial data available"

25  when consulting about whether federal actions may jeopardize listed species or adversely

26  modify critical habitat. 16 U.S.C. § 1536(a)(2); 50 C.F.R. §402.14(g)(8).

COMPLAINT– 39

1   141.    Recovery plans constitute the best available science and play a vital role in how ESA Section 7 consultations are conducted, as well as in judicial review of whether agencies are complying with their consultation duties under the ESA.

142.    While FWS acknowledged the existence of approved recovery plans for these species and the conservation recommendations proposed that the Forest Service apply habitat management objectives and species protection measures from approved recovery plans, FWS failed to fully address or implement those recovery plan objectives or relevant species protection measures in the the BiOp and failed to include them in the required reasonable and prudent measures in the incidental take statement. Indeed, the Project's anticipated effect of increasing human presence in John Long Canyon, which now serves as pristine habitat for the jaguar and spotted owls, is in stark contrast to the objectives and actions set forth in those recovery plans.

143.    In its BiOp, FWS' conservation recommendations suggest that the Forest Service "assist… in the implementation of the Jaguar Recovery Plan," but the FWS BiOp failed to address, analyze, or reconcile how the purpose of the Project is contrary to the primary objectives and recommended actions set out in the Jaguar Recovery Plan, which directs agencies to "restore jaguar habitat and corridors," including to "minimize the impact of roads on jaguars" and to "design roads to minimize jaguar habitat fragmentation and impacts on jaguar movement," because "creating more protected areas is among the most important conservation actions for jaguars and other large carnivores, indicating that conservation of key habitat areas is critical to the recovery of jaguars." Jaguar Recovery Plan, *supra* note 6, at 118. Nor does the BiOp address potential "unsustainable depletion of jaguar prey resources" and human-jaguar conflict that will result from increased hunting in the jaguar's habitat. *Id*. at 81.

144.    Relying on the flawed analysis in the BiOp, FWS further failed to protect the jaguar by neglecting to require implementation of necessary reasonable and prudent

1    measures to minimize the impact of incidental take. 16 U.S.C. § 1536(b)(4); 50 C.F.R. §

2    402.14(i).

3        145.    Mitigation measures for the Project incorporated into the BiOp's reasonable

4    and prudent measures fail to sufficiently protect the jaguar against two of the most acute

5    threats from the Project to his continued existence in the Chiricahua EMA: (1) hound

6    hunting and (2) disturbance from vehicles and increased human presence. Indeed, the

7    minimal measures the Forest Service is required to implement to mitigate some

8    disturbance from construction activity and proposed seasonal closures of the road going

9    into John Long Canyon are insufficient to prevent the net increase in human visitation,

10    which serves as the express goal of the project. Nor will it prevent potential harm or

11    harassment to the jaguar from hunters, especially hound hunters.

12        146.    Limiting construction activity to daytime, limiting 1.2 miles of the John

13    Long Canyon Road to administrative access, and seasonally closing the road into John

14    Long Canyon (from "approximately" March to August) are the only measures aimed at

15    mitigating impacts to the jaguar. But none of these measures adequately address the most

16    pressing threats to the listed species.

17        147.    First, it is an acknowledged fact that the greatest negative impacts derive

18    from the fact that these species' habitat will be opened to increased motorized activity and

19    human use that is noisy and disruptive (including hunting, hound-hunting and off-road

20    vehicle use) for an "indefinite" period. The first measure does not address this fact at all,

21    it merely reduces some of the temporary disturbance from construction activities. Second,

22    limiting a very small potion (1.2 miles) of the road impacting the jaguar's habitat to public

23    motorized use is insufficient to reduce the influx of motorized visitation to John Long

24    Canyon anticipated by the Project. The Biological Assessment for the Project

25    acknowledges that the largest threat to individual jaguars is increased human presence in

26    areas where they reside because jaguars are "intolerant of human presence." Finally,

seasonal closure of that road fails to restrict access in a manner that will protect the jaguar from hunters. The agency's failure to restrict access to the jaguar's habitat during mountain lion season – when the risk of harassment to the jaguar is greatest – does not comport with evidence in the record showing that the jaguar will leave his habitat permanently after just one negative encounter with hunting hounds.

148.    Between 1996 and 2020, of the seven to eight jaguars documented in the United States, at least three or four have been treed or bayed by mountain lion hunters with dogs, although there may be other unknown instances. In one case, a jaguar treed in the Whetstone Mountains by a mountain lion hunter using dogs subsequently left the range and was next detected in the Santa Rita Mountains more than thirteen air miles away.

149.    Increased hunting in the jaguar's habitat could put pressure on game populations that also serve as prey for jaguars, which could cause an increase in jaguar predation on livestock and a consequent increase in human-jaguar conflicts.

150.    The hunting season for mountain lions in Arizona is from August to May (which includes hound hunting), so reducing motorized access from March to August does not serve to protect the jaguar from this significant threat.

151.    Through its flawed BiOp, FWS additionally violated the ESA by failing to include any monitoring or reporting measures or requirements in the ITS for the jaguar. While the BiOp purported to incorporate "all conservation measures …, including … biological and compliance monitoring, and reporting measures," not a single monitoring or reporting measure was included. FWS thus violates the incidental take requirements set out in 50 C.F.R. § 402.14(i).

152.    FWS's finding in its Concurrence that the Project would not adversely impact spotted owls or their critical habitat is also arbitrary and capricious because the data contained in the Biological Assessment and repeated in the BiOp demonstrate adverse

COMPLAINT– 42

impacts to spotted owl critical habitat from, *inter alia*, camping, fuelwood collection and wildfires.

153.    As explained in greater detail below, for spotted owls, the Project's goal of providing increased access to areas of the Chiricahua EMA, including owl critical habitat in John Long Canyon and approximately 4.8 acres of Protected Activity Area, is in direct opposition with the Owl Recovery Plan's objectives of protecting spotted owls from the "primary threat" of habitat destruction or modification, threats of human activity and noise disturbance, minimization of recreational disturbance in Protected Activity Centers. The Owl Recovery Plan explains that human-managed alteration of forests in the southwest has rendered these areas vulnerable to wildlife.

154.    Relying on the Forest Service's flawed and inadequate Biological Assessment, FWS failed to engage in formal consultation on the spotted owl and include additional analysis on potential harm to spotted owls and their critical habitat in the BiOp or include reasonable and prudent measures to address threats to the species and their critical habitat.

155.    By failing to engage in formal consultation on the impacts of the Project, and relying on the unreasonable conclusion in the Biological Assessment that the Project "may affect, but is not likely to adversely affect," spotted owls and their critical habitat, FWS violated its obligations under ESA Section 7(a)(2).

156.    The data contained in the Biological Assessment and repeated in the BiOp demonstrates that the Project will have serious implications for spotted owls and their habitat through increased human disturbance. The Project will open a significant swath of spotted owl critical habitat in John Long Canyon and Pinery Canyon to adverse modification from motorized vehicle use, camping and fuelwood collection.

157.    Currently, John Long Canyon provides high-quality habitat for spotted owls due, in part, to minimal human disturbance. The Forest Service anticipates that restored

access to the Canyon will increase camping, hunting, firewood cutting, off-road vehicle use and other recreational activities.

158.    It will provide access to approximately thirty-eight acres of spotted owl critical habitat in John Long Canyon for camping and fuelwood collections.

159.    Road construction in North Fork of Pinery Canyon will allow for access to approximately 331 acres of critical habitat for camping and fuelwood collection within the 300-foot buffer of the road.

160.    Spotted owls are sensitive to ground-based activities, particularly noise disturbance, which may cause owls to change their behavior and alter nesting and roosting activities, increasing their vulnerability to predators and the likelihood of nest abandonment.

161.    The primary threat to spotted owls is habitat destruction or modification, and human disturbance is also a recognized threat.

162.    The BiOp for the Project explains that "[d]ispersed camping [that] will occur within approximately 4.8 acres of foraging habitat within the John Long Canyon [Protected Activity Center]" will result in effects to prey species habitat. BiOp, *supra* note 4, at 33. However, it unreasonably concludes that effects to foraging habitat in the Proposed Activity Center would be "discountable" because owls could still access the linear corridor along the road, and small mammals would still occur in the area. *Id*. at 33– 34. Further, the BiOp fails to take into account that if road construction occurs to and through John Long Canyon, there would be significant increase in motorized vehicle activity, as well as camping, hunting, firewood cutting, and OHV use, and increased wildfire risk.

163.    Many of these are noise-generating activities and could result in disturbance to spotted owls, reducing the suitability of pristine spotted owl critical habitat. Increased use by the public also increases the risk of introducing non-native species and the

1  possibility of wildfire, both of which could result in the destruction of spotted owl critical

2  habitat. Additionally, the Project will open the area to camping and fuelwood collection

3  within the 300-foot buffer of the proposed road, which may degrade up to thirty-eight

4  acres of critical habitat.

5      164.    FWS ignored scientific data in concluding that neither the spotted owls nor

6  their habitat will be adversely affected by the Project. The data included in the BiOp show

7  that increased public use of the area increases the risk of introducing non-native species

8  and the possibility of wildfire, which could result in negative impacts to spotted owls, and

9  that approximately 331 acres of critical habitat be impacted by the Project.

10     165.    Given the acknowledged impacts, FWS's determination in the Concurrence

11 that the Project "may effect, but [would] not likely… adversely affect" spotted owls and

12 their critical habitat is arbitrary and capricious.

13     166.    By failing to address the impacts of the Project on spotted owls and their

14 critical habitat, spotted owls were deprived of the benefits of formal consultation flowing

15 from additional analysis through the preparation of a BiOp, which serves as the basis for

16 preparation of an incidental take statement and required implementation of reasonable and

17 prudent measures and terms and conditions to minimize impacts.

18     167.    For the reasons stated above, the BiOp and Concurrence, which fail to

19 comply with the procedural and substantive requirements of the ESA are arbitrary,

20 capricious, an abuse of discretion, otherwise not in accordance, and were undertaken

21 "without observance of procedure required by law," 5 U.S.C. § 706(2), and violate the

22 ESA. 16 U.S.C. §1536(a)(2); 50 C.F.R. §§ 402.10-402.17.

23                       **THIRD CLAIM FOR RELIEF**

24                   **Against Forest Service Defendants**

25                 **Violations of ESA Section 7 and the APA**

26

168. Plaintiffs hereby incorporate by reference the allegations presented in all preceding paragraphs.

169. In relying on FWS's flawed BiOp for the jaguar and Concurrence for spotted owls, the Forest Service acted arbitrarily and capriciously, and violated its duty under ESA Section 7(a)(2). Additionally, the Forest Service violated ESA Section 7(a)(1) by failing to carry out programs for the conservation of endangered jaguars, who will be negatively impacted by the Project.

170. The Forest Service has an independent, substantive duty under Section 7(a)(2) of the ESA to ensure that its actions are not likely to jeopardize listed species or adversely modify their critical habitat. 16 U.S.C. § 1536(a)(2).

171. If the agency concludes that an action is "likely to adversely affect" listed species or critical habitat, it must enter into formal consultation with FWS. 50 C.F.R. §§ 402.12(k), 402.14. Even where an action is unlikely to result in jeopardy or adverse modification of its critical habitat, consultation ensures that FWS analyzes all direct and indirect effects of a proposed action on listed species and ultimately "specifies the impact of such incidental taking on the species" and "specifies those reasonable and prudent measures that [FWS] considers necessary or appropriate to minimize such impact." 16 U.S.C. § 1536(b)(4)(C)(i), (ii).

172. After completion of consultation, if a biological opinion does not satisfy the ESA's standards, the action agency may not rely on it to fulfill its Section 7 duties.

173. Decision notices and findings of no significant impact are "final agency actions" subject to review under the APA. A final agency action may be set aside if it is arbitrary and capricious, and/or if it was made without observance of a procedure required by law.

174. The Forest Service's determinations regarding the adverse impacts the Project would have on the federally listed jaguar and spotted owls were based on flawed

analysis in the BiOp and Concurrence which, as explained in greater detail above, contained internal inconsistencies, incomplete analysis of potential harms, alternatives and mitigation measures, and entirely ignored that a primary anticipated impact of the Project – shifting visitation into John Long Canyon – is directly at odds with the proposed actions and objectives set out in relevant recovery plans. Accordingly, the Forest Service violated Section 7(a)(2) of the ESA by relying on FWS' unlawful and arbitrary BiOp for the jaguar and FWS' Concurrence for the Mexican spotted owl.

175.   Because of its reliance on FWS's flawed analysis in the Concurrence, the Forest Service failed to engage in formal consultation on the spotted owl under ESA Section 7(a)(2) as it was required to do.

176.   The Forest Service recognizes three main categories of effects that may occur to spotted owls resulting from the Project: (1) habitat loss and/or degradation; (2) impacts related to increased human presence and heavy equipment use (i.e., disturbance from increased human presence, and noise); and (3) long-term increased human presence in or near spotted owl habitat.

177.   Nevertheless, by relying on the flawed Concurrence prepared by FWS, the Forest Service signed off on and plans to carry out a project that will exacerbate these threats in precious spotted owl critical habitat.

178.   Given the acknowledged impacts in the Biological Assessment and BiOp, the Forest Service's reliance on FWS's determination that the Project "may effect, but [would] not likely… adversely affect" spotted owls and their critical habitat in the Concurrence is arbitrary and capricious.

179.   By failing to address the impacts of the Project on spotted owls and their critical habitat, spotted owls were deprived of the benefits of formal consultation flowing from additional analysis through the preparation of a BiOp, which serves as the basis for

1    preparation of an incidental take statement and required implementation of reasonable and

2    prudent measures and terms and conditions to minimize impacts.

3        180.   The Forest Service additionally violated its affirmative duty under ESA

4    Section 7(a)(1) to develop and carry out programs for the conservation of endangered and

5    threatened species. 16 U.S.C. § 1536(a)(1).

6        181.   While Federal agencies have discretion regarding "which measures to

7    undertake as part of their conservation programs, agencies' core obligation to comply with

8    ESA Section 7(a)(1) is not discretionary."[7] Further, conservation programs implemented

9    pursuant to this section must be "meaningful," and it is insufficient if the program only

10   has "insignificant effects" on the conservation of listed species.[8]

11       182.   For jaguars, the Jaguar Recovery Plan is the only existing plan or program

12   developed for the conservation of the species, and the Forest Service committed to

13   implementing it with respect to any activities that could threaten jaguar recovery in its

14   own Forest Plan.

15       183.   The Coronado Forest Plan guidelines for the protection of listed species

16   requires that "[a]ctivities occurring within federally listed species habitat… apply habitat

17   management objectives and species protection measures from approved recovery plans."

18   Coronado Forest Plan, *supra* note 3, at 67. The Forest Plan contains no other species-

19   specific protections for the jaguar.

20

21   [7] U.S. Dep't of the Interior, *Memorandum: Federal Agency Obligations under Section
22   7(a)(1) of the Endangered Species Act* ("7(a)(1) Memo") 3 (Feb. 6, 2024),
     https://www.fws.gov/sites/default/files/documents/federal-agency-obligations-under-
23   section-7-a-1-memo-2024-02-06.pdf (citing *Defs. Of Wildlife v. U.S. Fish & Wildlife*, 797
24   F. Supp. 2d 949, 960 (D. Ariz. 2011); *Sierra Club v. Glickman*, 156 F.3d 606, 617-18 (5th
     Cir. 1998)).
25   [8] 7(a)(1) Memo, *supra* note 7 (citing *Fla. Key Deer v. Paulison*, 522 F.3d 1133, 1147 (11th
26   Cir. 2008) (holding that FEMA's program to conserve was so insignificant as to amount
     to inaction)).

COMPLAINT– 48

184.    Nevertheless, the Forest Service failed to implement the Jaguar Recovery Plan's objectives and actions in proposing and approving the Project.

185.    A primary impact anticipated by the Forest Service in carrying out the Project is the shifting of human presence into the jaguar's habitat in John Long Canyon. Accordingly, not only is the agency failing to perform its affirmative duty to carry out programs for the conservation of endangered species, but it has approved an action which contradicts the habitat management objectives and species protection measures from the approved Jaguar recovery plan and the will undermine the recovery plan's conservation goals.  For example, those management objectives and protection measures that call for the protection of jaguars and their habitat from, *inter alia*, human activity, development and roads; restoration of jaguar habitat and corridors; and designing roads to minimize habitat fragmentation and impacts on jaguar movement.

186.    In the absence of any other program developed or carried out by a federal agency to promote the recovery of jaguars in the United States, the Forest Service's failure to apply the habitat management objectives and species protection measures set forth in the Jaguar Recovery Plan constitutes a violation of section 7(a)(1) of the ESA.

187.    For the reasons stated above, the Forest Service's reliance on the flawed BiOp and its Concurrence in issuing the Decision Notice is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with the law, undertaken "without observance of procedure required by law," 5 U.S.C. § 706(2), and is in violation of the ESA. 16 U.S.C. §1536(a)(2); 50 C.F.R. §§ 402.10-402.17. The Forest Service additionally violated its affirmative obligations under Section 7(a)(1) of the ESA by failing to carry out programs for the conservation of federally listed jaguars in proposing and approving the Project.

### FOURTH CLAIM FOR RELIEF

### Against Forest Service Defendants

### Violations of NFMA, the Coronado Forest Plan, and the APA

188.    Plaintiff hereby incorporates by reference the allegations presented in all preceding paragraphs.

189.    Pursuant to NFMA, all site-specific actions taken within a National Forest, including resource plans and permits must be consistent with applicable forest plans. 16 U.S.C. § 1604(i); 36 C.F.R. § 219.15. The Forest Service's decisions must comply with both the Coronado Forest Plan, including all standards and guidelines associated with the plan.

190.    First, the Coronado Forest Plan provides that "[a]ctivities occurring within federally listed species habitat should apply habitat management objectives and species protection measures from approved recovery plans." Coronado Forest Plan, *supra* note 3, at 67. As explained in greater detail above, in approving the Project, the Forest Service failed to implement habitat management objectives and species protection measures for jaguars and spotted owls from their respective recovery plans. These include but are not limited to the Jaguar Recovery Plan's recovery actions calling for assessment, protection and restoration of habitat to support viable populations of jaguars; minimization and mitigation of the effects of expanding human development on jaguar survival; and maintaining and increasing the number and total area of protected areas containing "high-quality jaguar habitats or that serve as important corridors" for jaguar movement in the Borderlands Security Area; as well as the Owl Recovery Plan's direction that agencies minimize recreational disturbance in Protected Activity Centers.

191.    Additionally, in approving the Project, the Forest Service failed to comply with the Coronado Forest Plan's guidelines to protect northern goshawks, which require, *inter alia*, a minimum of three goshawk nest areas and three replacement nest areas per goshawk territory; designated post-fledging areas surrounding nesting sites; retaining of "reserve trees" in certain goshawk foraging areas and post-fledgling family areas; and that human presence should be minimized between March 1 and September 30. *Id*. at 67. In

its environmental analysis for the Project, the Forest Service noted that goshawks are found within three miles of the project vicinity, EA, *supra* note 2, at 29, but failed to address impacts on goshawk nests or habitat in accordance with the guidelines in the Plan. Additionally, the seasonal closure of the John Long Canyon road between March and August does not meet the standard set forth in the guideline, which calls for the minimization of human presence in all occupied goshawk nest areas through the end of September.

192.    According to the 2011 Transport Analysis Plan for the Chiricahua EMA, goshawks are found in forest habitat and their distribution "overlaps that of the Mexican Spotted Owl in the Chiricahua EMA." It further notes that "[c]oncerns are virtually identical for goshawks as for Mexican spotted owl, with the primary potential impact from newly constructed roads being disturbance of breeding birds." Nevertheless, the Biological Evaluation for the project merely notes that "[g]oshawks might pass through the area foraging may be temporarily disturbed or avoid the area," and that "an individual could be affected," effects would not lead to loss of population viability or trend toward listing. Accordingly, the Forest Service failed to comply with the Coronado Forest Plan's guidance for protection of northern goshawks.

193.    Next, in approving the Project, the Forest Service failed to comply with the Coronado Forest Plan's "desired condition" that "roads, recreational sites, and other manmade features do not impede animal movement or contribute to habitat fragmentation." Coronado Forest Plan, *supra* note 3, at 67. As explained in greater detail above, the Forest Service recognizes that the Project will reduce available habitat and impede movement for at least the jaguar, spotted owls and northern goshawks. The Forest Service anticipates that these species will avoid and/or abandon Project areas currently serving as pristine habitat due to their remoteness, access to water and prey abundance as a result of the anticipated increase in human recreational activity that serves as the sole

basis for the Project.

194.    Finally, when approving the Project, the Forest Service failed to comply with Coronado Forest Plan's "desired condition" that "[n]ative species that are known to have been present during the first decade of the 21st century continue to exist." *Id*. Jaguars are native to the Chiricahua mountains and have been present during the first half of the 21st century. Because, as explained in greater detail above, the Project will likely result in, at best, the jaguar avoiding or abandoning his habitat and, at worst, him being harassed or killed due to increased human presence in John Long Canyon, the Project will likely cause this species to no longer exist in the Coronado Forest.

195.    For the reasons set forth above, the Forest Service is in violation of NFMA for failing to ensure the Project complies with the Coronado Forest Plan, and its actions are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law under the APA. 5 U.S.C. § 706(2)(A).

WHEREFORE, Plaintiffs pray for relief as set forth below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court grant the following relief:

(1)    Declare that Forest Service Defendants have violated and are violating NEPA, 42 U.S.C. §§ 4321 *et seq*., and implementing CEQ regulations, 40 C.F.R. §§ 1500.1 *et seq*., by failing to properly analyze the indirect, direct and cumulative effects of the Project on federally listed spotted owls and the jaguar and other resources and by issuing an arbitrary and capricious Decision Notice and FONSI for the Project that is at odds with the significant impacts to species and the environment acknowledged by the agency;

(2)    Declare that FWS violated the ESA and the APA in issuing its arbitrary and capricious Biological Opinion and Concurrence;

COMPLAINT– 52

1     (3)    Declare that the Forest Service violated the ESA and APA by relying on

2  FWS's unlawful Biological Opinion and Concurrence in approving the Project;

3     (4)    Declare that Forest Service Defendants have violated and are violating

4  Section 7(a)(1) of the ESA, 16 U.S.C. § 1536(a)(1), by failing to carry out programs for

5  the conservation of endangered jaguars;

6     (5)    Declare that Forest Service Defendants have violated and are violating

7  NFMA, 16 U.S.C. §§ 1600 *et seq*., by failing to ensure the Project complies with the

8  governing land management plan;

9     (6)    Vacate the Decision Notice, Biological Opinion and Concurrence, and

10  enjoin implementation of the Project unless and until the Forest Service and FWS can

11  demonstrate full compliance with the law;

12     (7)    Award Plaintiffs' costs incurred in pursuing this action, including attorney's

13  fees, as authorized by the Equal Access to Justice Act, 28 U.S.C. § 2412(d), the

14  Endangered Species Act, 16 U.S.C. § 1540(g)(4), and other applicable provisions; and

15     (8)    Grant such other and further relief as the Court deems just and proper.

16

17  Dated:    August 19, 2024     Respectfully submitted,

18

19                       Adriane J. Hofmeyr (AZ Bar # 025100)
                           HOFMEYR LAW PLLC

20                       3849 E. Broadway Blvd., #323
                           Tucson, AZ 85716

21                       Phone: (520) 477-9035
                       adriane@hofmeyrlaw.com

22

23                       Lisa T. Belenky (CA Bar No. 203225)
                       CENTER FOR BIOLOGICAL DIVERSITY

24                       1212 Broadway, Suite 800
                       Oakland, CA 94612

25                       Phone: (510) 844-7107

26                       lbelenky@biologicaldiversity.org

COMPLAINT– 53

*Applicant Pro Hac Vice*

Tala DiBenedetto (NY Bar No. 5836994)
CENTER FOR BIOLOGICAL DIVERSITY
P.O. Box 371
Oceanside, NY 11572-0371
Phone: (718) 874-6734, ext. 555
tdibenedetto@biologicaldiversity.org
*Applicant Pro Hac Vice*

*Attorneys for Plaintiffs*

COMPLAINT– 54