**WO**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF ARIZONA**

Center for Biological Diversity, et al.,

Plaintiffs,

v.

United States Forest Service, et al.,

Defendants.

No. CV-24-00405-TUC-RM

**ORDER**

Pending before the Court are the parties' cross-Motions for Summary Judgment (Docs. 34, 36), and Defendants' Motion to Strike Extra-Record Materials (Doc. 40). The Motions for Summary Judgment are fully briefed (Docs. 38, 41), as is the Motion to Strike (Docs. 42, 45). For the following reasons, the Court will grant in part and deny in part both cross-Motions for Summary Judgment, and will grant the Motion to Strike.

**I. Statutory Background**

**a. NEPA**

The National Environmental Policy Act ("NEPA") is "primarily a procedural statute," *Prutehi Litekyan: Save Ritidian v. United States Dep't of Airforce*, 128 F.4th 1089 (9th Cir. 2025), *cert. granted sub nom. Dep't of the Air Force v. Prutehi Guahan*, (2026), that aims to "prevent or eliminate damage to the environment and biosphere[,]" 42 U.S.C. § 4321. NEPA achieves these goals "through a set of 'action-forcing' procedures that require that agencies take a 'hard look' at [the] environmental consequences'" of their actions, and "provide for broad dissemination of relevant environmental

information." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976)). NEPA "does not mandate particular results; it simply prescribes the necessary process" for assessing the environmental impact of agency action. *Id.*

NEPA requires that agencies prepare a report called an Environmental Assessment ("EA") "determin[ing] whether the action will have a significant effect on the environment." *Kern v. U.S. Bureau of Land Mgmt.*, 284 F.3d 1062, 1066 (9th Cir. 2002) (quoting *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983)). If the agency determines that the action will have such an effect, then the agency must prepare an Environmental Impact Statement ("EIS"). *Id.* If, on the other hand, "the EA reveals no significant effect," then "the agency may issue a Finding of No Significant Impact ("FONSI")." *Id.*

**b. Endangered Species Act**

The Endangered Species Act ("ESA") "was enacted, in relevant part, to provide for the conservation of endangered and threatened species, as well as the ecosystems upon which such species depend." *Ctr. for Biological Diversity v. Jewell*, 248 F. Supp. 3d 946, 950 (D. Ariz. 2017), *amended in part*, No. CV-14-02506-TUC-RM, 2017 WL 8788052 (D. Ariz. Oct. 25, 2017) (citing 16 U.S.C. § 1531(b)). The Secretary must designate "critical habitat" for species designated as endangered or threatened ("listed species"), consisting of the areas containing natural features that are "essential to the conservation of the species" and which "may require special management considerations or protection." 16 U.S.C. § 1532(5)(A).

The ESA requires "federal agencies authorizing, funding, or carrying out actions that may affect listed species or their critical habitat—so-called 'action agencies'—to engage in consultation" with either the Fish and Wildlife Service ("FWS"), for terrestrial species, or the National Marine Fisheries Service, for marine species. *Pacificans for a Scenic Coast v. California Dep't of Transportation*, 204 F. Supp. 3d 1075, 1083 (N.D. Cal. 2016) (citing 16 U.S.C. § 1536(a)(2)). Section 7 of the ESA requires federal agencies to

ensure that their action "is not likely to jeopardize the continued existence" of any listed species "or result in the destruction or adverse modification" of the critical habitat of any listed species. 16 U.S.C. § 1536(a)(2).

If critical habitat or listed species are present in an area of agency action, the agency undertaking the action generally prepares a Biological Assessment to determine whether the listed species or critical habitat is "likely to be affected" by the proposed action. *Nat. Res. Def. Council v. Haaland*, 102 F.4th 1045, 1055 (9th Cir. 2024). If the action agency determines—and the applicable wildlife management agency concurs—that the proposed action is "not likely to adversely affect listed species or critical habitat, the consultation process is terminated, and no further action is necessary." *Id.* (citing 50 C.F.R. § 402.13(c)). If the action agency determines that the proposed action is "likely to adversely affect listed species or a critical habitat," however, formal consultation is required. *Id.* (citing 50 C.F.R. § 402.14(a)-(b)). Formal consultation requires the preparation of a Biological Opinion, which determines whether the proposed action would likely jeopardize a listed species or critical habitat. *Id.* (citing 16 U.S.C. § 1536(b)(3)(A)). If there is a finding that the proposed action would jeopardize a listed species or critical habitat, the applicable wildlife management agency must suggest "reasonable and prudent alternatives" that can be used to avoid such jeopardization. *Id.* (citing 16 U.S.C. § 1536(b)(3)(A)).

If an action is not likely to result in jeopardy to a listed species, but is reasonably likely to result in "take" incidental to the proposed action, then the consulting agency must attach an Incidental Take Statement to the Biological Opinion. 16 U.S.C. § 1536(b)(4). "Take" is defined as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). Any taking that is subject to an Incidental Take Statement and which is in compliance with the terms and conditions of that Statement is not a prohibited taking under the ESA, and no other authorization or permit under the ESA is required. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 909 (9th Cir. 2012). Take may be expressed as either an amount or an extent; if the take specified in the Incidental Take Statement is exceeded, consultation under

Section 7 of the ESA must be reinitiated in order to confirm that the "no jeopardy" determination remains valid. *Id.*

**c. National Forest Management Act**

The National Forest Management Act ("NFMA") "charges the Forest Service with the management of national forest land, including planning for the protection and use of the land and its natural resources." *All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1109 (9th Cir. 2018). As part of its responsibilities under the NFMA, the Forest Service must develop a Land and Resource Management Plan ("Forest Plan") for each National Forest. *Id.* at 1110. "Site-specific projects and activities must be consistent with an approved forest plan." *Id.* (citing 16 U.S.C. § 1604(i)); *see also Native Ecosystems Council v. U.S. Forest Serv.*, 418 F.3d 953, 961 (9th Cir. 2005) ("It is well-settled that the Forest Service's failure to comply with the provisions of a Forest Plan is a violation of NFMA.").

**II. Factual Background**

Plaintiffs' claims in this action arise from Defendants' proposal to construct 2.7 miles of new road segments across land located in the Chiricahua Ecosystem Management Area of the Douglas Ranger District of the Coronado National Forest. (USFS010223.) The Chiricahua Public Access Project ("the Project") aims to "restore and secure permanent, legal, motorized public access to existing National Forest System roads on Forest Service managed land in John Long Canyon, North Fork of Pinery Canyon, and Horseshoe Canyon[.]" (*Id.*) The motivating force for the Project is a "lack of permanent, legal, motorized public access to these areas due to intervening private lands." (*Id.*) The 2018 Coronado National Forest Land and Resource Management Plan ("Forest Plan") included as an objective "[i]ncreas[ing] the number of permanent legal access routes to and within the Coronado National Forest by resolving the legal status deficiencies of 40 to 50 existing and proposed National Forest System roads and trails[.]" (*Id.*) Guidelines issued in support of this objective state that if private landowners are unwilling to grant right-of-way easements to allow access to public land, roads or trails should be "realigned and/or

reconstructed." (*Id.*)

The proposed roads would ensure permanent, legal motorized access[1] to existing road systems that are currently blocked, or could be blocked, by private landowners. (USFS10227-32.) In John Long Canyon, a private land parcel has cut off public access to the final 2.8 miles of John Long Canyon Road for "about 37 years." (USFS10227.) If constructed, the new bypass road would be 0.7 miles in length, and would allow seasonal public access—the bypass would close between August 1 and March 1—to the final stretch of John Long Canyon Road. (USFS10228.) In North Fork of Pinery Canyon, motorized public access to North Fork of Pinery Canyon Road has been blocked by a private land parcel since 2016. (USFS10229.) The proposed bypass would be 1.2 miles in length and would restore public access to 4.1 miles of Forest Service roads. (*Id.*) In Horseshoe Canyon, a proposed 0.25-mile bypass would ensure motorized public access to 16 miles of Forest Service roads that, while currently accessible, are at risk of loss of access due to adjacent private land. (USFS10231.) Dispersed camping would be permitted within 300 feet of all proposed bypass roads. (USFS10227-231.)

Pursuant to its obligations under NEPA, the Forest Service issued a final Environmental Assessment on May 31, 2023 (USFS10219), and a Finding of No Significant Impact on September 19, 2023 (USFS10418). Pursuant to its obligations under the ESA, the Forest Service initiated consultation by preparing a Biological Assessment for the Project, which was completed in July 2021. (USFS9660-9693.) The Biological Assessment considered the effects of the Project on three federally protected species: the jaguar, the ocelot, and the Mexican Spotted Owl ("MSO"). (*Id.*) The Biological Assessment found that the Project "may affect, but is not likely to adversely affect" the ocelot, the MSO, and the MSO's designated critical habitat. (USFS9671-83.) However, the Biological Assessment found that the Project "may affect, and is likely to adversely affect" the jaguar, and therefore requested formal consultation regarding the jaguar from the FWS. (USFS9675.)

---

[1] The new roads would be "Maintenance Level 2," accessible to only high clearance vehicles. (USFS10241; USFS10249.)

The FWS issued a Concurrence agreeing with the Biological Assessment's determination that the Project "may affect, but is not likely to adversely affect" the ocelot, the MSO, and the MSO's designated critical habitat. (FWS373-75.) In light of the Forest Service's request for formal consultation regarding the jaguar, the FWS prepared a formal Biological Opinion which found that the Project "is not likely to jeopardize the continued existence of the jaguar." (FWS361.) The Biological Opinion included an Incidental Take Statement for the jaguar; on April 18, 2025, an Amended Biological Opinion was issued that contained a revised Incidental Take Statement. (FWS406.) The revised Incidental Take Statement included a "Monitoring and Reporting section and clearer criteria for reinitiation." (*Id.*) Both the Amended Biological Opinion and the Concurrence discuss Recovery Plans prepared by the FWS for the MSO and the jaguar.[2] (*See* USFS6733; USFS3839.)

The revised Incidental Take Statement anticipates that any jaguar in the action area of the Project will be taken in the form of harassment as a result of the proposed action; however, the authorized take does not include injury or death to any jaguar. (FWS429.) It goes on to say that "[t]ake will be considered exceeded if a jaguar is found injured or killed from a vehicular strike within the action area," and that "[s]hould a jaguar be found injured or killed within the action area due to the proposed action . . . the Forest Service will reinitiate consultation[.]" (FWS430.) The Monitoring and Reporting requirements dictate that "[s]hould the Forest Service receive a report of an injured or dead jaguar, the Forest Service will inform the Service and open an investigation to determine the cause of take to determine if exceedance has occurred." (*Id.*) The Forest Service is further required to submit annual monitoring reports to the Arizona Ecological Services Field Office following implementation of the Project "until either this biological opinion is reinitiated, or data is provided showing that the project poses no effect to jaguars or that identified effects in the action area are insignificant or discountable." (FWS431.)

Plaintiffs are organizations dedicated to the conservation of wildlife. (Doc. 26 at 5-

[2] Under the ESA, Recovery Plans must be prepared for all endangered and threatened species. *Conservation Cong. v. Finley*, 774 F.3d 611, 614 (9th Cir. 2014).

9.)[3] Their members regularly recreate in the area of the proposed Project and devote considerable time and resources to studying the wildlife that appears in John Long Canyon, North Fork of Pinery Canyon, and Horseshoe Canyon, with particular emphasis on the jaguar. (Docs. 34-1, 34-2, 34-3, 34-4, 34-5.) Plaintiffs allege that the Forest Service violated NEPA by failing to take the required "hard look" at the impacts of the Project; that the FWS violated the ESA by issuing an Amended Biological Opinion, Concurrence, and Incidental Take Statement that were arbitrary and capricious; that the Forest Service violated the ESA by relying on the arbitrary and capricious documents set forth above; that the Forest Service violated the ESA by failing to carry out the Jaguar Recovery Plan; and that the Forest Service violated the NFMA by failing to comply with certain provisions of the Forest Plan. (*See* Doc. 34.) Defendants oppose all the foregoing claims, and allege that Plaintiff's motivations for bringing this suit arise from a desire to prevent other members of the public from enjoying the lands that would become more accessible as a result of the Project. (*See* Doc. 36-1.)

## III. Motion to Strike

Attached to Plaintiffs' reply in support of their cross-Motion for Summary Judgment is a Request for Judicial Notice. (Doc. 38-1.) Plaintiffs request that the Court take judicial notice of three documents: an Amended Final Reinitiated Biological and Conference Opinion for the Rosemont Copper Mine, Pima County, Ariz.; a Biological Opinion for Ongoing and Future Military Operations and Activities at Fort Huachuca, Ariz.; and 2025-2026 Arizona Hunting Regulations. (Doc. 39-1 at 2.) Following Plaintiffs' submission of the reply and attached Request, Defendants filed a Motion to Strike, in which they contend that the Court's review of this matter must be limited to the documents contained in the Administrative Record. (Doc. 40.) Plaintiffs respond that the Request is proper because claims brought under the citizen-suit provision of the ESA are not subject to the limits on the consideration of outside evidence mandated by the Administrative Procedure Act ("APA"). (Doc. 42.) Defendants reply that the claim Plaintiffs cite the extra-record

[3] All citations to the record herein refer to the page numbers generated by the Court's electronic filing system.

materials in support of cannot have been brought under the ESA's citizen-suit provision, and that the limits on review of extra-record materials prescribed by the APA must therefore apply. (Doc. 45.)

Under Local Rule of Civil Procedure 7.2(m), a party may move to strike "any part of a filing or submission on the ground that it is prohibited (or not authorized) by a statute, rule, or court order." When considering a claim arising under the APA, the scope of judicial review is confined to "the administrative record already in existence, not some new record made initially in the reviewing court." *Camp v. Pitts*, 411 U.S. 138, 142 (1973); 5 U.S.C. § 706 ("[T]he court shall review the whole record or those parts of it cited by a party.").[4] However, the APA only applies where there is "no other adequate remedy in a court," 5 U.S.C. § 704, and where a claim may be brought instead under the citizen-suit provision of the ESA, the APA—and its limit on the consideration of extra-record materials—does not apply. *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472, 497 (9th Cir. 2011). A challenge to a completed biological opinion and accompanying incidental take statement issued under Section 7 of the ESA is properly pled under the APA, and does not arise under the ESA's citizen-suit provision. *Bennett v. Spear*, 520 U.S. 154, 173 (1997) (holding that the citizen-suit provision of the ESA "cannot be interpreted to include the [Secretary of the Interior's] maladministration of the ESA").

Here, the only claim which Plaintiffs cite their proposed extra-record materials in support of is their claim that the Incidental Take Statement issued for the jaguar is invalid. (*See* Doc. 38 at 15-22.) Given that challenges to a completed biological opinion and accompanying incidental take statement must arise under the APA, and not the citizen-suit provision of the ESA, the rule prescribed by the APA that a reviewing court is limited to consideration of the administrative record must apply. Accordingly, Defendants' Motion to Strike will be granted, and the Court has not considered the documents contained in Plaintiffs' Request for Judicial Notice.

. . . .

[4] Plaintiffs did not file a motion to complete or supplement the Administrative Record in this matter, and the deadline to do so expired on September 29, 2025. (Doc. 23 at 2.)

**IV. Standard of Review**

Courts review agency decisions alleged to have violated NEPA, ESA, and the NFMA under the standard of review set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A). *Lands Council v. McNair*, 537 F.3d 981, 987 (9th Cir. 2008), *overruled in part on other grounds by Winter v. Nat'l Res. Def. Council*, 555 U.S. 7 (2008) (reviewing action challenged under NEPA and NFMA under the APA); Sa*n Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 601 (9th Cir. 2014) (reviewing action challenged under the ESA under the APA).

Under the APA, an agency action must be set aside "if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Nw. Ecosystem Alliance v. U.S. Fish & Wildlife Serv.*, 475 F.3d 1136, 1140 (9th Cir. 2007) (quoting 5 U.S.C. § 706(2)(A)). Under this "highly deferential" standard of review, the reviewing court's role is limited to determining whether "a reasonable basis exists" for the agency's decision. *Indep. Acceptance Co. v. Cal.*, 204 F.3d 1247, 1251 (9th Cir. 2000) (internal quotation marks omitted). The Court may not "substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). So long as the agency "considered the relevant factors and articulated a rational connection between the facts found and the choice made," the agency's action must be affirmed. *Balt. Gas & Elec. Co. v. Natural Res. Def. Council*, 462 U.S. 87, 105 (1983).

However, agency action must be set aside if the agency "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency," or rendered a decision "so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43.

Judicial review of agency action is generally limited to evidence contained in the administrative record. *Love v. Thomas*, 858 F.2d 1347, 1356 (9th Cir. 1988). The court's role is not to act as a fact finder but, rather, to determine, as a matter of law, whether the

agency's decision is supported by the administrative record. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985). Because cases involving review of final agency action under the APA do not generally involve disputed facts, summary judgment is typically the proper mechanism for resolving them. *See Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18 F.3d 1468, 1472 (9th Cir. 1994); *see also* Fed. R. Civ. P. 56(a) (summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law").

Challenges to agency action must relate to *final* agency action. *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997). A Biological Opinion constitutes final agency action. *Id.* While Biological Assessments are not generally considered final agency action under the APA, a Concurrence is final agency action because it "marks the consummation of the agency's decisionmaking process." *Id.* at 178; *see also Friends of the River v. Nat'l Marine Fisheries Serv.*, 786 F. App'x 666, 669 (9th Cir. 2019). When final agency action, such as a Concurrence, relies on a Biological Assessment to conclude that no further consultation is necessary, however, a court may also review the underlying Biological Assessment. *All. for the Wild Rockies v. United States Forest Serv.*, 504 F. Supp. 3d 1162, 1189 (E.D. Wash. 2020). A Finding of No Significant Impact ("FONSI") issued pursuant to NEPA is final agency action. *Env't Def. Ctr. v. Bureau of Ocean Energy Mgmt.*, 36 F.4th 850, 868 (9th Cir. 2022).

## V. Discussion

### a. NEPA

Plaintiffs argue that, for several reasons, the Forest Service's Environmental Assessment and subsequent FONSI are deficient in analysis regarding the impact of the Project on the jaguar. (Doc. 34 at 21-22.) Plaintiffs state that the Environmental Assessment "failed to adequately analyze the impacts of loss and fragmentation of important jaguar habitat," and that the agency wrongfully brushed off its finding that jaguars would avoid the action area during Project construction by noting that there is a large amount of suitable habitat available in the Chiricahua Mountains. (*Id.* at 21.)

Plaintiffs further contend that the Forest Service's observation that vehicular traffic may disrupt the corridor used by the jaguar to travel between the Chiricahua and Dos Cabeza Mountains is a "general statement" insufficient to satisfy NEPA. (*Id.* at 22.) Plaintiffs argue that the Project "undermines the conservation objectives and actions set forth in the Jaguar Recovery Plan," and that the FONSI is arbitrary and capricious considering the Forest Service's acknowledgment of threats to jaguars. (*Id.*)

In addition, Plaintiffs argue that the Forest Service's Environmental Assessment and subsequent FONSI lack sufficient analysis regarding the impact of the Project on the MSO. (*Id.*) In Plaintiffs' view, the Forest Service failed to contend with the findings of the MSO Recovery Plan that the MSO is threatened by habitat fragmentation caused by road construction, and that increased human access may lead to fuelwood cutting and other disturbances that damage MSO habitat. (*Id.*) Plaintiffs further point out that the Project area encompasses 4.8 acres of a proposed MSO Protected Activity Center ("PAC"),[5] and that the Environmental Assessment wrongfully neglected to include discussion of impacts to the proposed PAC. (*Id.* at 23.) Finally, Plaintiffs argue that the Environmental Assessment fails to adequately address wildfire risks from the Project, which Plaintiffs state are "a particular concern for spotted owls and their critical habitat." (*Id.*)

In response, Defendants point out that Federal Regulations specify that Environmental Assessments carried out pursuant to NEPA are to be "concise." (Doc. 36-1 at 23 (citing 40 C.F.R. § 1508.9(a)).) Defendants explain that the Environmental Assessment incorporates by reference the Biological Assessment carried out pursuant to Defendants' obligations under the ESA,[6] and that Federal Regulations direct agencies to "reduce excessive paperwork" by integrating the requirements of NEPA with other environmental review requirements. (*Id.* at 24.) Defendants argue that the Biological Assessment carefully considered both the short-term disturbances caused by road

[5] The MSO Recovery Plan explains that Protected Activity Centers ("PACs") are sections of land designated for the protection of a core nest/roost area for the MSO. (USFS4118.) PACs should be at least 600 acres in area "configured around the activity center." (USFS4120.)

[6] USFS10245.

construction, and the long-term impacts of increased human presence throughout the Project area following road construction. (*Id.* at 25.) Defendants next argue that the Environmental Assessment reasonably explained that habitat quality in the Project area is expected to rebound except within the footprint of newly constructed roads, and that given the wide range of the jaguar, effects to its habitat would be insignificant. (*Id.*)

Defendants contend that Plaintiff's arguments regarding the Environmental Assessment's alleged inconsistency with the Jaguar Recovery Plan are incorrect because NEPA does not mandate any particular results, only consideration of the potential impacts of a project. (*Id.* at 27.) Defendants maintain that in light of the inaccessibility of the roads to non-high clearance vehicles, the lack of developed recreation sites in any area of the Project, and the expected minimal impact nature of wilderness hikers, the finding that the Project would not have a significant impact on jaguar habitat was reasonable and reasonably explained. (*Id.* at 27-28.) Defendants attribute Plaintiffs' problems with the agencies' NEPA analysis to substantive disagreement with the wisdom of undertaking the Project. (*Id.* at 28.)

In response to Plaintiffs' arguments regarding the alleged insufficiency of Defendants' analysis of Project impacts on the MSO, Defendants again point out that the analysis of the Biological Assessment was incorporated into the Environmental Assessment. (*Id.* at 29.) Defendants proffer a paragraph from the Biological Assessment acknowledging that 4.8 acres of an MSO PAC fall within the action area of the Project, and note that the Biological Assessment explains that the road adjacent to the affected MSO PAC would be closed between March 1 and August 15 each year, most of the MSO breeding season. (*Id.*) Defendants proffer an additional paragraph from the Environmental Assessment that explains that construction of the Project roads would not occur at night, when MSO are active. (*Id.* at 30.) In countering Plaintiffs' claims that the Environmental Assessment's analysis of wildfire risks to the MSO is lacking, Defendants state that Plaintiffs' own arguments necessarily draw upon several portions of the Environmental Assessment that do tackle the possibility of wildfire risk. (*Id.* at 30-31.)

Both sides cite the Supreme Court's recent decision in *Seven County Infrastructure Coalition v. Eagle County, Colorado*, 605 U.S. 168 (2025). In *Seven County*, the Court explained that a "course correction of sorts is appropriate to bring judicial review under NEPA back in line with the statutory text and common sense," and that "the central principle of judicial review in NEPA cases is deference." *Id.* at 179-84. A reviewing court should not substitute its judgment for that of the agency, but inquire only whether the "agency action was reasonable and reasonably explained." *Id.* at 180. "Under NEPA, an agency's only obligation is to prepare an adequate report." *Id.* However, as Plaintiffs indicate, an adequate report must contain more than "general statements about possible effects and some risk[.]" *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1213 (9th Cir. 1998) (internal quotation marks omitted).

Here, the Court concludes that Defendants' Environmental Assessment and subsequent FONSI were reasonable and reasonably explained, and therefore adequate under NEPA. First, the Environmental Assessment incorporates by reference a more than three-page discussion contained in the Biological Assessment that thoroughly details the impacts of the Project upon the jaguar and its habitat. (*See* USFS9672-9676.) Plaintiffs take issue with the Biological Assessment's determination that overall impacts to jaguar habitat would be insignificant in light of the small size of the Project area, but this conclusion is adequately explained. The Biological Assessment calculates that, even when taking into consideration a 300-foot buffer zone to allow for camping around the newly constructed roads and the roads that they will provide access to, only 1,857 acres of the jaguar's 291,511-acre range in the Chiricahua mountains will be affected. (USFS9673-74.)

Moreover, contrary to Plaintiffs' argument that the Biological Assessment does not grapple with the impacts of that loss, the document states that "[i]ncreased human presence and the resulting disturbance could lead to jaguar avoidance of these areas. This would result in loss of available habitat that the jaguar may be accustomed to using for hunting or movement corridors. It could also cause a jaguar to travel longer distances, possibly through less suitable habitat, to avoid these areas." (USFS9675.) The Biological

Assessment provides specific details regarding how many visitors are currently estimated to visit John Long Canyon on a yearly basis—400 to 425—and acknowledges that while the Project is not expected to increase the overall visitation to the Chiricahuas, more frequent visitation to John Long Canyon may occur. (USFS9674.) The Biological Assessment further acknowledges that hunters, a large share of overall visitors to the Chiricahuas, may cause particular disruption to the jaguar due to the use of dogs and noise disturbance caused by gunshots. (*Id.*)

Plaintiffs' argument that the adequacy of the NEPA analysis is somehow undermined by the existence of the Jaguar Recovery Plan is also unavailing. Indeed, in setting forth this argument Plaintiffs betray that their concerns are more in line with apprehensions about the Project itself rather than Defendants' analysis of it, stating straightforwardly that "[t]he Project undermines the conservation objectives and actions set forth in the Jaguar Recovery Plan[.]" (Doc. 34 at 22.) As Defendants correctly point out, however, NEPA does not mandate particular results, and nothing in the statute requires agencies to reach an environmentally favorable decision.

The Court also finds that the Forest Service's NEPA analysis was sufficient as to the environmental impacts of the Project on the MSO and its habitat. Like the analysis of impacts to the jaguar, the Environmental Assessment incorporates by reference a substantial discussion of Project impacts on the MSO set forth in the Biological Assessment. (USFS9679-9683.) Over the course of approximately four pages, the Biological Assessment acknowledges that noise caused by both a long-term increase in human presence to the action area and short-term construction, as well as a reduction in foraging habitat within the Project area, may affect the MSO. (*Id.*) The Biological Assessment concludes that in light of the small size of the action area, however, these impacts are not expected to be significant. (USFS9683.) This conclusion is well explained, because the document details the exact overlap of the Project action area with MSO critical habitat. (USFS9679-9683.) The Biological Assessment explains that when taking into consideration a 300-foot buffer zone for camping around newly constructed roads, 369

acres in North Fork of Pinery Canyon and 38 acres in John Long Canyon, out of the total 186,843 acres in the relevant critical habitat unit, are expected to be affected by the Project. (*Id.*)

As Defendants point out in response to Plaintiffs' argument that the Forest Service's analysis failed to take into account the findings of the MSO Recovery Plan, the Biological Assessment explains that "[t]he MSO Recovery Plan states that the primary threat to the species is destruction or modification of its habitat, with timber management and stand-replacing fire cited as primary factors. Human activity in occupied habitat has also been cited as a threat." (USFS9679.) The Biological Assessment further acknowledges that the MSO Recovery Plan sets forth guidelines for the management of noise disturbance during MSO breeding season—March 1 to August 31—that apply to MSO Protected Activity Centers. (*Id.*) It goes on to say that John Long Canyon Road, which is adjacent to an MSO Protected Activity Center, would be closed between March 1 and August 15 each year, encompassing most of the MSO breeding season. (USFS9683.)

Again in contrast to Plaintiffs' characterization of the Forest Service's analysis, the Biological Assessment acknowledges that a PAC is being created to protect a newly discovered MSO pair in the vicinity of the Project, and that "approximately 4.8 acres of the 600-acre PAC" may be affected by the Project. (USFS9679.) As discussed above, the Biological Assessment is clear about the consequences to land affected by the Project in the context of the MSO; it states that "[t]here are three main categories of effects that may occur to MSO as a result of the proposed action: 1) habitat loss/degradation; 2) impacts related to increased human presence and heavy equipment use (i.e., disturbance from increased human presence, and noise); and 3) long term increased human presence in a new location following implementation." (USFS9680.) Accordingly, the Court finds unavailing Plaintiffs' argument that the Forest Service failed to acknowledge the existence of the newly created PAC.

Finally, Plaintiffs take issue with the Forest Service's discussion of fire risk to MSO, but the Biological Assessment recognizes that "[i]ncreased use by the public also

increases the risk of . . . wildfire," and the Environmental Assessment states that the "[t]he Douglas Ranger District fire management officer concluded, based on professional judgement, experience in wildland firefighting, and familiarity with the project area, that the proposed action would not measurably change fire frequency or behavior in the project area." (USFS9681; 10240.) The Environmental Assessment specifies that the fire management officer "cites a history of relatively few fires (approximately 30 fires from 1921 to 2021) in a 5-mile radius surrounding each of the three project sites, and no fires near existing open roads." (USFS10240.) These statements evince adequate consideration of wildfire risk by the Forest Service, and, critically, it is not the role of the Court to second-guess informed scientific judgments. *See Seven Cnty.*, 605 U.S. at 182.

In light of the foregoing, the Court will grant summary judgment in favor of Defendants, and against Plaintiff, as to the First Claim for Relief in Plaintiffs' First Amended Complaint.

**b. ESA**

In addition to their claims under NEPA, Plaintiffs allege several distinct violations of the ESA. (*See* Doc. 34.) First, Plaintiffs claim that the Amended Biological Opinion for the jaguar, and FWS's Concurrence with the Forest Service's finding that the Project "may affect, but is not likely to adversely affect" the MSO and its critical habitat, are arbitrary and capricious because they ignored the best available science contained in the Recovery Plans for each species. (*Id.* at 24-27.) Next, Plaintiffs claim that the Incidental Take Statement issued for the jaguar is arbitrary and capricious. (*Id.* at 27.) Finally, Plaintiffs contend that by failing to carry out the Jaguar Recovery Plan, the Forest Service violated Section 7(a)(1) of the ESA. The Court will address each claim in turn.

**1. Whether the Amended Biological Opinion for Jaguar and Concurrence for MSO Satisfy Best Available Science Standard**

Agencies are required to use "the best scientific and commercial data available" when fulfilling their consultation obligations under the ESA. 16 U.S.C. § 1536(a)(2). Failure to comply with this requirement violates the APA. *San Luis & Delta-Mendota*

*Water Auth. v. Locke*, 776 F.3d 971, 995 (9th Cir. 2014). "The purpose of the best available science standard is to prevent an agency from basing its action on speculation and surmise." *Id.* (citing *Bennett v. Spear*, 520 U.S. 154 (1997)). In order to comply with the best available science standard when engaging in consultation, an agency must not "ignore available studies." *Id.* Separately from the agencies' obligation to engage in consultation, the ESA also requires the preparation of recovery plans for all endangered and threatened species.[7] *Conservation Cong. v. Finley*, 774 F.3d 611, 614 (9th Cir. 2014) (citing *Friends of Blackwater v. Salazar*, 691 F.3d 428 (D.C. Cir. 2012)).

Here, FWS's Amended Biological Opinion for the jaguar acknowledges that the Jaguar Recovery Plan finds that habitat destruction and modification are one of the most significant threats to the jaguar, but the Amended Biological Opinion fails to consider research in the Jaguar Recovery Plan showing that road construction has an outsized impact on ecological systems, and on large carnivores in particular. (*See* FWS421; USFS6800.) The Jaguar Recovery Plan cites a study finding that "[c]arnivores are particularly vulnerable to extinction in fragmented landscapes, owing to intrinsic biological traits, such as large body sizes, large area requirements, low densities, and slow population growth rates, as well as external anthropogenic threats, including hunting and other forms of direct mortality[.]" (USFS6800.) The same study set forth that "[r]oads are among the most widespread and impose some of the most lasting impacts on ecosystems of all human-made linear infrastructures[.]" (*Id.*) The Court concludes that the Amended Biological Opinion for the jaguar fails to comply with the "best available science" standard, and is therefore invalid.

By contrast, the FWS's Concurrence with the Forest Service's finding that the Project "may affect, but is not likely to adversely affect" the MSO and its critical habitat adequately considers threats identified in the MSO Recovery Plan. The Biological Assessment upon which the Concurrence is premised recognizes that "[t]he MSO Recovery

[7] While the recovery plans "provide guidance for the conservation of . . . species, they are not binding authorities." *Conservation Cong. v. Finley*, 774 F.3d 611, 614 (9th Cir. 2014) (citing *Friends of Blackwater v. Salazar*, 691 F.3d 428 (D.C. Cir. 2012)).

Plan states that the primary threat to the species is destruction or modification of its habitat, with timber management and stand-replacing fire cited as primary factors. Human activity in occupied habitat has also been cited as a threat." (USFS9679.) The Biological Assessment goes on to note that the MSO recovery plan "provides noise disturbance management recommendations which apply to Protected Activity Centers . . . during the breeding season (March 1st–August 31st)[.]" (*Id.*)

The Biological Assessment explains that the Project will be implemented between October 1 and March 1 in order to avoid the MSO breeding season, and that, as set forth above, John Long Canyon Road will be closed to motorized use from March 1 to August 15 each year. (USFS9680-81.) In light of the reduction in auditory disturbances that will be implemented by seasonal access restrictions, and the small size of the Project area, the Biological Assessment concludes that the Project "may affect, but is not likely to adversely affect" the MSO and its critical habitat. (USFS9683.) The Court finds that this conclusion is sufficiently supported by the administrative record. The FWS's Concurrence with the Forest Service's finding that the Project "may affect, but is not likely to adversely affect" the MSO and its critical habitat, is not arbitrary, capricious, or otherwise contrary to law.

Accordingly, the Forest Service did not violate the ESA by relying upon the Concurrence, but did violate the ESA by relying upon the Amended Biological Opinion. Summary judgment will be entered against Plaintiffs on the portions of Plaintiffs' Second and Third Claims for Relief that contend that the Concurrence is invalid, and summary judgment will be entered in favor of Plaintiffs on the portions of the above claims for relief that contend that the Amended Biological Opinion for the jaguar is invalid.

**2. Incidental Take Statement for Jaguar**

Plaintiffs further contend that the Incidental Take Statement issued for the jaguar is legally insufficient. (Doc. 34 at 27.) Plaintiffs argue that the Incidental Take Statement "fails to set a numerical limit on take of jaguars from the Project without explanation as to why such a limit is impractical to obtain and employ[,]" and Plaintiffs point out that the initial Biological Opinion prepared for the Project in 2022 did set a numerical limit. (*Id.* at

28.) Plaintiffs further argue that the Incidental Take Statement does not provide meaningful requirements for monitoring the anticipated take because the anticipated take includes only harassment of jaguars, but take will only be considered exceeded if a jaguar is found injured or killed from a vehicle strike. (*Id.* at 28-29.) Finally, Plaintiffs argue that the Incidental Take Statement is in violation of the ESA because it does not include "reasonable and prudent measures necessary or appropriate to minimize the impact of the incidental take on the species." (*Id.* at 30.)

Defendants respond that under 50 C.F.R. § 402.14(i), take may be quantified as either an amount or an extent, and that the Incidental Take Statement's determination that "any jaguar (should they be present in the action area) will be taken in the form of harassment" is therefore not unduly broad. (Doc. 36-1 at 39.) Furthermore, Defendants counter Plaintiffs' objections regarding the Incidental Take Statement's monitoring requirements by asserting that Plaintiffs point to nothing in the ESA nor case law "suggesting that a [Biological Opinion] cannot rely on take in the form of injury or death as an indicator that authorized take in the form of harassment has been exceeded." (*Id.* at 42.) Defendants argue that the current monitoring scheme in the Incidental Take Statement has been adequately explained by FWS, proffering the agency's statement that quantification of take associated with the Project is difficult because "if any jaguar avoids the area due to disturbance . . . it would be difficult to determine the number of jaguars potentially taken since they would avoid the area and not be detected." (*Id.* (citing FWS445).) Finally, Defendants assert that the Incidental Take Statement need not list "reasonable and prudent measures" because the inclusion of such measures is a matter committed to agency discretion. (*Id.* at 44.)

Section 7(b)(4) of the ESA requires that an Incidental Take Statement specify the "impact" of the incidental take on the listed species. 16 U.S.C. § 1536(b)(4)(C)(i). ESA implementing regulations clarify that "impact" in this context means the "amount or extent" of incidental take. 50 C.F.R. § 402.14(i)(1)(i). It is well-established that the legislative history of the ESA indicates that Congress "clearly declared a preference for

expressing take in numerical form" with respect to Incidental Take Statements issued under Section 7. *Ctr. for Biological Diversity v. Salazar*, 695 F.3d 893, 911 (9th Cir. 2012). However, a numerical limit need not be specified if the FWS is able to "establish that no such numerical value could be practically obtained." *Arizona Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1250 (9th Cir. 2001). Whether or not a numerical limit on take is established, an Incidental Take Statement must contain measurable guidelines to determine when incidental take would be exceeded, and the obligation to reinitiate consultation triggered. *Oregon Nat. Res. Council v. Allen*, 476 F.3d 1031, 1039-40 (9th Cir. 2007) (holding that an Incidental Take Statement allowing the take of "all spotted owls" associated with a project was invalid because it failed to set forth a trigger that would reinitiate the consultation process).

In addition to specifying the "impact" of incidental take on listed species, the ESA also requires that an Incidental Take Statement "specif[y] those reasonable and prudent measures that the Secretary considers necessary or appropriate to minimize such impact," and "set[] forth the terms and conditions . . . that must be complied with . . . to implement" the reasonable and prudent measures. *Ctr. for Biological Diversity v. Culver*, No. 21-CV-07171-SI, 2024 WL 4505468 at *64 (N.D. Cal. Oct. 15, 2024); *see also Oregon Nat. Res. Council*, 476 F.3d at 1034 ("The Incidental Take Statement must: (1) specify the impact of the incidental taking on the species; (2) specify the 'reasonable and prudent measures' that the FWS considers necessary or appropriate to minimize such impact; (3) set forth 'terms and conditions' with which the action agency must comply to implement the reasonable and prudent measures (including, but not limited to, reporting requirements)[.]") (citing 16 U.S.C. § 1536(b)(4)(C)). While the FWS has the discretion to decide what the reasonable and prudent measures and accompanying terms and conditions are, an agency's failure to include them on the basis that they are "baked into" a project is contrary to the plain language of the ESA. *Culver*, 2024 WL 4505468 at *63.

Here, the Incidental Take Statement in the Amended Biological Opinion issued for the jaguar states that "[t]he Service anticipates that any jaguar (should they be present in

the action area) will be taken in the form of harassment as a result of this proposed action." (FWS429.) The take "does not include injury or death." (*Id.*) It goes on to say that "[t]ake will be considered exceeded if a jaguar is found injured or killed from a vehicular strike within the action area. No jaguars are anticipated to be injured or killed by vehicular traffic on the roads with increased motorized vehicle access due to the proposed action. Should a jaguar be found injured or killed within the action area due to the proposed action (i.e., restored public access), the Forest Service will reinitiate consultation[.]" (FWS430.)

The Court first concludes that the FWS's failure to specify a numerical limit on take of jaguar is not arbitrary and capricious because the agency rationally explained why setting such a limit was impractical. The original Biological Opinion as to the jaguar stated that "one jaguar will be taken in every 10 years (the average lifespan of a jaguar) in the form of harm as a result of this proposed action. This take does not include injury or death, but is a consequence of human disturbance that may prevent a jaguar from using areas with high human activity and cause it to shift its activities to other areas of the mountain range[.]" (FWS444.) The FWS explained, however, that the above statement was altered to its current form in the Amended Biological Opinion because "if any jaguar avoid the area due to disturbance . . . it would be difficult to determine the number of jaguars potentially taken since they would avoid the area and not be detected." (FWS445.) FWS further explained that "[t]his change was also made because if a jaguar is taken (i.e., not detected) it would be difficult to attribute that take to the project rather than other circumstances such as reduced access from Mexico." (*Id.*) Although Plaintiffs argue that the original Biological Opinion demonstrates that a numerical limit is practical, they fail to account for the agency's reasoned explanation otherwise.

However, the Court concludes that Defendants' failure to include a trigger for reinitiation of consultation that is causally connected to the anticipated take was arbitrary and capricious. As a preliminary matter, the Incidental Take Statement set forth in the Amended Biological Opinion is not clear as to whether consultation must be reinitiated only when a jaguar is injured or killed from a vehicular strike, or whether other causes of

injury or death that may be "due to the proposed action," such as interaction with hunters and/or their dogs, would trigger consultation. (*See* FWS430.) No matter what the agency intended, the lack of an articulated, rational connection between when consultation must be reinitiated—injury or death to the jaguar—and the only authorized take—harassment of the jaguar—is arbitrary and capricious. *See Arizona Cattle Growers' Ass'n*, 273 F.3d at 1251 (holding that the use of ecological conditions as a surrogate for defining the amount or extent of incidental take is reasonable so long as these conditions are linked to the take of the protected species). "The terms of an Incidental Take Statement do not operate in a vacuum," *id.*, and because there may be as few as one jaguar in the entirety of the Chiricahua Mountains,[8] it is unclear what the point of reinitiation of consultation would be if that single jaguar were already dead.

Finally, the Court agrees with Plaintiffs that FWS's failure to include reasonable and prudent measures and terms and conditions implementing them in the Incidental Take Statement was contrary to law. In regard to reasonable and prudent measures, the Incidental Take Statement sets forth the following: "The conservation measures negotiated in cooperation with the Service and included as part of the proposed action constitute all the reasonable measures necessary to minimize the impacts of incidental take. On that basis, no reasonable and prudent measures are included in this Incidental Take Statement." (FWS430.) Defendants assert that the foregoing statement is entirely appropriate in light of the discretion committed to FWS in determining reasonable and prudent measures (Doc. 36-1 at 43), but this argument ignores that there are two separate statutory obligations at play.

An agency must engage in consultation in order to fulfill its obligation to ensure that any action it carries out "is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species[.]" 16 U.S.C. § 1536(a)(2). Even if the action will not jeopardize the continued existence of a threatened species, the FWS is required to issue

[8] USFS6799.

a written statement specifying the impact of incidental take on the species and "reasonable and prudent measures . . . to minimize such impact[.]" 16 U.S.C. § 1536(b)(4)(C). Allowing a "no jeopardy" finding to relieve an agency of the obligation to minimize the impact on a threatened species would have the practical result of collapsing the foregoing independent statutory obligations in upon one another.

Defendants further contend that requiring reasonable and prudent measures to be listed in the Incidental Take Statement would be a "meaningless make-work exercise," and that the result of such a holding would be to merely force the FWS to "copy and paste the proposed action, and all its protective and conservation measures, into the Incidental Take Statement as reasonable and prudent measures." (Doc. 36-1 at 44.) However, "requiring FWS to include these prospective items specifically in the [Incidental Take Statement] is better practice than requiring the Forest Service . . . to hunt and peck through" the text of the proposed Project to determine the "conservation measures" that the FWS is referring to. *See Save the South Fork Salmon, et. al. v. U.S. Forest Service, et. al.*, No. 1:25-CV-00086-AKB, 2026 WL 2409733 at *27 (D. Idaho Aug. 18, 2026).

For the foregoing reasons, the Court concludes that the Incidental Take Statement for the jaguar contained in the Amended Biological Opinion is arbitrary and capricious and otherwise contrary to law. The Court will therefore enter summary judgment in favor of Plaintiffs, and against Defendants, regarding the portion of Plaintiffs' Second Claim for Relief that alleges that the FWS prepared a flawed Incidental Take Statement.

**3. Forest Service's Compliance with ESA Section 7(a)(1)**

Plaintiffs' final claim under the ESA is that "[b]y failing to implement the Jaguar Recovery Plan, the Forest Service violated its affirmative duty under ESA Section 7(a)(1) to develop and carry out programs for the conservation of endangered and threatened species." (Doc. 34 at 31.)[9] Section 7(a)(1) provides that agencies outside the Department

---

[9] Additionally, in support of this claim Plaintiffs point out that "[t]he Coronado Forest Plan guidelines for the protection of listed species require that '[a]ctivities occurring within federally listed species habitat . . . apply habitat management objectives and species protection measures from approved recovery plans.'" (Doc. 34 at 31) (citing USFS6502).) While Forest Plans created pursuant to the NFMA are binding authorities, *see All. for the Wild Rockies v. United States Forest Serv.*, 907 F.3d 1105, 1110 (9th Cir. 2018), the

of the Interior must "[carry] out programs for the conservation of endangered species and threatened species[.]" Defendants counter that "an agency's obligation under ESA Section 7(a)(1) does not attach to any and all site-specific projects an agency undertakes, and certainly does not require the Forest Service to 'implement the Jaguar Recovery Plan' as part of a local action to increase public motorized access to existing roads in the Coronado National Forest." (Doc. 36-1 at 46.)

Plaintiffs' position that the Forest Service's alleged failure to implement the Jaguar Recovery Plan violates the ESA cannot prevail in light of the clear rule that recovery plans are advisory authorities only. In response to a similar argument, the Eleventh Circuit persuasively reasoned that "the practical effect of the Plaintiffs' position would be to elevate the . . . Recovery Plan into a document with the force of law. We cannot take such an approach. Section 1533(f) makes it plain that recovery plans are for guidance purposes only." *Fund for Animals, Inc. v. Rice*, 85 F.3d 535, 547 (11th Cir. 1996). The court went on to say that "the Plaintiffs' position cannot be reconciled with the [action agency's] statutory duty under § 7 of the ESA to consult with the F.W.S. about the environmental impact of proposed agency actions and the F.W.S.'s duty to arrive at a biological opinion based upon the best scientific data available. There would be absolutely no point to the consultation and preparation of a biological opinion if the F.W.S.'s opinion were predetermined based upon whether proposed project lands fell within the borders of properties discussed in one of any number of recovery plan documents." *Id.*

Plaintiffs assert that the Ninth Circuit's decision in *Pyramid Lake Paiute Tribe of Indians v. United States Department of Navy*, 898 F.2d 1410 (9th Cir. 1990), supports their

---

requirements of an "otherwise advisory" document, such as a recovery plan, do not become binding unless incorporated into a Forest Plan and the implementing language creates a mandatory rule. *See Ecology Ctr. v. Castaneda,* 574 F.3d 652, 660-61 (9th Cir. 2009). Here, the Jaguar Recovery Plan is not expressly incorporated into the Coronado Forest Plan, and the provision of the Coronado Forest Plan cited by Plaintiffs states only that the agencies "*should* apply habitat management objectives and species protection measures from approved recovery plans." (USFS6502 (emphasis added).) The word "should" is suggestive, not mandatory. *Ecology Ctr.*, 574 F.3d at 661. Finally, the provision cited by Plaintiffs is a "guideline," which the Forest Plan states "may be modified somewhat for a specific project if the intent of the guideline is followed and the deviation is addressed in a decision document with supporting rationale." (USFS6447.)

claim, but this argument is unavailing. Federal agencies do have "affirmative obligations" to protect listed species under ESA § 7(a)(1). *Id.* at 1417 (citing *Carson–Truckee Water Conservancy Dist. v. Clark*, 741 F.2d 257, 262 n.5 (9th Cir. 1984)). However, an expansive interpretation of § 7(a)(1) would unacceptably "divest an agency of virtually all discretion in deciding how to fulfill its duty to conserve." *Id.* at 1418. "[T]he statute does not require particular conservation action," and "it is clearly beyond a court's authority to order that any specific conservation action [] be undertaken." Defs*. of Wildlife v. Sec'y, U.S. Dep't of the Interior*, 354 F. Supp. 2d 1156, 1174 (D. Or. 2005) (citing *WaterWatch of Oregon v. United States Army Corps of Engineers*, 2000 WL 1100059 at *11 (D. Or. 2000)).

Accordingly, the Court rejects Plaintiffs' claim that the Forest Service has violated Section 7(a)(1) by allegedly failing to carry out the Jaguar Recovery Plan as part of the proposed Project. The Court will enter summary judgment in favor of Defendants, and against Plaintiffs, on the portion of Plaintiffs' Third Claim for Relief that alleges that the Forest Service violated Section 7(a)(1) by failing to carry out programs for the conservation of endangered jaguars.

**c. NFMA**

Plaintiffs assert that the Forest Service violated the NFMA in approving the Project because "the Forest Service failed to comply with the Coronado Forest Plan's guidelines to protect Northern goshawks[.]" (Doc. 34 at 32.) Defendants counter that the Biological Evaluation provides an analysis regarding the Project's effects on the Northern goshawk that sufficiently demonstrates that the Project is consistent with the Coronado Forest Plan's guidelines[10] for protecting the goshawk. (Doc. 36-1 at 49.)

As discussed above, the Forest Service has a substantive obligation to ensure that "[s]ite-specific projects and activities . . . be consistent with an approved forest plan." *All. for the Wild Rockies*, 907 F.3d at 1109. However, the Forest Service should be given

[10] As noted above, guidelines "may be modified somewhat for a specific project if the intent of the guideline is followed and the deviation is addressed in a decision document with supporting rationale." (USFS6447.) Defendants do not argue that any deviation from the Forest Plan guidelines regarding the Northern goshawk was addressed in a decision document with supporting rationale. (*See* Doc. 36-1 at 47-50.)

"ample latitude in ensuring the consistency of its actions with Forest Plans[.]" *Oregon Nat. Desert Ass'n v. United States Forest Serv.*, 957 F.3d 1024, 1035 (9th Cir. 2020). A court should conclude that the Forest Service has acted arbitrarily and capriciously "only when the record plainly demonstrates that the Forest Service made a clear error in judgment in concluding that a project meets the requirements of the NFMA and relevant Forest Plan." *Id.* (citing *The Lands Council v. McNair*, 537 F.3d 981 (9th Cir. 2008)). While a reviewing court "cannot defer to a void," it should not upset a decision explained with "less than ideal clarity . . . if the agency's path may reasonably be discerned." *Id.* (internal quotation marks and citations omitted).

Here, the paucity of its analysis regarding the Northern goshawk demonstrates that the Forest Service's conclusion that the Project is consistent with the Coronado Forest Plan's guidelines to protect Northern goshawks was a clear error in judgment. The Coronado Forest Plan guidelines for protecting Northern goshawks consist of the following.

> a. A minimum of three goshawk nest areas and three replacement nest areas should be located per goshawk territory. Goshawk nest and replacement nest areas should generally be located in drainages, at the base of slopes, and on northerly (northwest to northeast) aspects. Nest areas should generally be 25 to 30 acres in size.
>
> b. Goshawk post-fledging areas of approximately 420 acres in size should be designated surrounding nest sites.
>
> c. In goshawk foraging areas and post-fledging family areas, groups of three to five reserve trees should be retained within management created openings greater than 1 acre in ponderosa pine-evergreen oak and dry mixed-conifer communities, and six reserve trees should be retained within management created openings greater than 0.5 acre in wet mixed-conifer and spruce-fir communities.
>
> d. In occupied goshawk nest areas, human presence should be minimized between March 1 and September 30 (Reynolds et al. 1992).

(USFS8368.)

The Biological Evaluation for the Project states in regard to the effects of the Project on the goshawk that "removal of old trees would be minimized. Removal of any common

nest trees such as large Arizona or ponderosa pines is not anticipated." (USFS10397.) Defendants assert that in light of these statements, "the Project is fully consistent with the Forest Plan's first three goshawk guidelines." (Doc. 36-1 at 49.) However, these highly general statements are not at all sufficient to show compliance with the detailed requirements set forth in the Forest Plan. It appears that the proposed Project would take place at least partly within Northern goshawk territory, USFS9535, and Defendants do not make an assertion to the contrary. (*See* Doc. 36-1 at 47-50.)

The parties contest whether occupied goshawk nest areas exist in the Project area, which would trigger the application of the fourth goshawk protection guideline. (Doc. 36-1 at 49, Doc. 38 at 29.) It is precisely this lack of clarity that again demonstrates that the Forest Service's judgment that the Project is consistent with the goshawk protection guidelines was in error. The Forest Service's decision is not simply poorly explained in the administrative record, but not explained at all. Defendants point to nowhere in the record showing that relevant goshawk territory was surveyed or explaining why it could not be surveyed more closely; to allow agencies to conclude that proposed action is consistent with land management guidelines where no information has been gathered as to the relevant land would render the Forest Plan a nullity. Accordingly, the agency's conclusion that the Project is consistent with the Coronado National Forest Plan was arbitrary and capricious.

Defendants argue that Plaintiffs' NFMA claim wrongfully attempts to impose a NEPA-like reporting requirement for projects that must be consistent with a relevant Forest Plan. (Doc. 41 at 25.) They assert that the Forest Service is not required to actively demonstrate compliance with NFMA, and that Plaintiffs' challenge must therefore fail. (*Id.*) While it is true that the text of the NFMA does not require the Forest Service to produce a written document explaining why its actions are compliant with an applicable Forest Plan,[11] the agency's decisionmaking must nonetheless find some support in the

---

[11] Although the parties do not address the issue, the Court notes that the Code of Federal Regulations does appear to implement just such a requirement. *See* 36 C.F.R. § 219.15(d) ("A project or activity approval document must describe how the project or activity is consistent with applicable plan components.").

record. *Oregon Nat. Desert Ass'n*, 957 F.3d at 1035. Here, the agency's decisionmaking path is simply not discernable, and it is on this basis that the Court concludes that Plaintiffs' NFMA claim succeeds. The Court will enter summary judgment in favor of Plaintiffs, and against Defendants, on Plaintiffs' Fourth Claim for Relief.

## VI. Remedy

Plaintiffs contend that upon a finding by the Court that any of the agency action analyzed above is invalid, the relevant action should be vacated. (Doc. 34 at 33.) Defendants respond that "vacatur is not a mandatory remedy," and argue that "the appropriate remedy would be to remand the decision and analysis at issue back to the relevant agency without vacatur."[12] (Doc. 36-1 at 50.) In determining whether to vacate an unlawful agency action, a reviewing court must weigh the seriousness of the deficiencies and the disruptive consequences of vacatur. *Montana Wildlife Fed'n v. Haaland*, 127 F.4th 1, 50 (9th Cir. 2025) (discussing *Allied-Signal, Inc. v. U.S. Nuclear Regul. Comm'n*, 988 F.2d 146, 150–51 (D.C. Cir. 1993)).

Here, the Court finds that vacatur of the Amended Biological Opinion and the Incidental Take Statement for the jaguar is appropriate. Issuing a revised Biological Opinion and Incidental Take Statement for the jaguar may require further research by FWS. In addition, in light of the deficiencies identified as to the Forest Service's compliance with guidelines for the protection of the Northern goshawk, the Final Decision Notice for the Project must also be vacated. The Final Decision Notice concludes that the Project is consistent with the NFMA,[13] but Defendants point to no documents in the Administrative Record indicating that the Project is consistent with guidelines set forth in the Forest Plan for the protection of the Northern goshawk. While disturbance to the implementation of the Project is to be expected as a result of vacatur, the Court finds that such disturbance is outweighed by the importance of ensuring compliance with both the ESA and Forest Plan guidelines.

---

[12] Defendants further request that the Court order briefing on the appropriate remedy in this matter. The Court finds that it is not necessary to do so.

[13] USFS10426.

Accordingly,

**IT IS ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 34), and Defendants' Motion for Summary Judgment (Doc. 36) are **granted in part and denied in part** as set forth above.

**IT IS FURTHER ORDERED** that Defendants' Motion to Strike (Doc. 40) is **granted**. The portion of Plaintiffs' reply in support of Plaintiffs' Motion for Summary Judgment containing materials outside the Administrative Record (Doc. 38-1) is **stricken**.

**IT IS FURTHER ORDERED** that the Amended Biological Opinion and Incidental Take Statement for the jaguar are **vacated**, and **remanded** to the Fish & Wildlife Service for formulation of a revised Biological Opinion and Incidental Take Statement for the jaguar that address the deficiencies identified in this Order.

**IT IS FURTHER ORDERED** that the Final Decision Notice for the Chiricahua Public Access Project is **vacated**, and **remanded** to the Forest Service for further analysis of the Project's consistency with Coronado Forest Plan guidelines for the protection of the Northern goshawk.

**IT IS FURTHER ORDERED** that the Clerk of Court is directed to close this case.

Dated this 30th day of September, 2026.

Honorable Rosemary Márquez
United States District Judge